13 Cal.App.4th 1718 (1993)
17 Cal. Rptr.2d 282
In re JOSHUA H., a Person Coming Under the Juvenile Court Law.
FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
LINDA H., Defendant and Appellant.
LINDA H., Petitioner,
v.
THE SUPERIOR COURT OF FRESNO COUNTY, Respondent;
FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, Real Party in Interest.
Docket Nos. F017994, F018435.
Court of Appeals of California, Fifth District.
March 8, 1993.
*1720 COUNSEL
Stephanie A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant and for Petitioner.
No appearance for Respondent Superior Court.
Phillip S. Cronin, County Counsel, and William G. Smith, Deputy County Counsel, for Plaintiff and Respondent and for Real Party in Interest.
[Opinion certified for partial publication.[]]
*1721 OPINION
DIBIASO, J.
Linda H. challenges a disposition order in a juvenile dependency matter involving her young son Joshua H. Infant Joshua suffered severe physical abuse at the hands of his mother's boyfriend; the mother knew her boyfriend was abusing her son. (Welf. & Inst. Code,[1] § 300, subd. (e).) Based on these circumstances and pursuant to section 361.5, subdivisions (b)(5) and (c), the juvenile court declined to order any reunification services for the mother and set the matter for a permanency planning hearing under section 366.26. This court stayed the section 366.26 proceedings pending review. We will deny the mother's writ petition and dismiss her appeal.
In the published portion of this opinion, we will discuss the parameters of section 300, subdivision (e). We will also hold that a parent need not personally abuse his or her child in order to be denied reunification services under section 361.5, subdivision (b)(5).

STATEMENT OF CASE AND FACTS
In February 1992, the Fresno County Department of Social Services (the department) initiated dependency proceedings concerning the minor Joshua H., who was then nine months old. In an amended petition, the department alleged the infant came within juvenile court jurisdiction under section 300, subdivisions (a), (e) and (g), as follows:
"WIC 300(a) [sic]
"The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian.
"COUNT a-1: On or about February 1, 1992, said minor's mother, Linda [H.], slapped said minor's face causing significant bruising to the right side of the face.
"COUNT a-2: Between on or about January 31, 1992 and February 7, 1992 said minor's mother used undue force in administering medication to *1722 said minor by grasping his throat with her thumb and middle finger causing deep bruising.
".... .... .... .... .... .... ....
"WIC 300(e) [sic]
"The child is under the age of five and has suffered severe physical abuse by a parent, or by any person known by the parent, and the parent knew or reasonably should have known that the person was physically abusing the child.
"COUNT e-1: Between on or about January 31, 1992 and February 11, 1992 said minor sustained injuries inflicted on him by said minor's mother's boyfriend. These injuries included but are not limited to bruises on the top of the head caused by head butts, bruising of the upper legs, bruising on the stomach and eight broken ribs. Said minor's mother, Linda [H.], was aware of the abuse being inflicted by Mr. [G.] but made no effort to intercede. Further, Ms. [H.] sought to hide the abuse from mandated reporters and sought no medical treatment for said minor's injuries.
".... .... .... .... .... .... ....
"WIC 300(g) [sic]
"The child has been left without any provision for support; or the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child; or a relative or other adult custodian with whom the child resides or has been left is unwilling or unable to provide care or support for the child, the whereabouts of the parent is unknown, and reasonable efforts to locate the parent have been unsuccessful.
"COUNT g-1: Said minor's father, Raul [G.], has not provided a plan for said minor's supervision or support. Further, the whereabouts of Mr. [G.] are unknown at this time and reasonable efforts to locate him have not been successful."
The minor was detained in out-of-home placement.
At the jurisdictional hearing, the mother submitted the matter on the social study, dated March 17, 1992, prepared by the department, from which the *1723 following statement of facts relating to the section 300, subdivision (e) allegation is taken.[2]
Linda H. was a 17-year-old who until mid-January of 1992 lived in Texas with her son and her grandparents. She had had nothing to do with the baby's father since before Joshua was born. In the fall of 1991 she met Ryan G., a 16-year-old from Fresno, who was staying with a relative in Texas at the request of his mother.
In January 1992, Ryan received his mother's permission to not only return to Fresno but to bring Linda and the baby with him. The three arrived in Fresno in mid-January. Linda and Ryan settled in Clovis.
Almost immediately the baby began "getting on Ryan's nerves" and the teenager was unable to control his emotions. Ryan would pick on the baby and become angry when Linda gave Joshua more attention. Eventually, Ryan started injuring the child. The situation became increasingly worse when Linda commenced school around the first of February.
On two occasions, Linda witnessed Ryan using his open hand against the baby's forehead and pushing him, causing Joshua to fall. Another time she attempted to stop Ryan from hitting Joshua with a closed fist; the baby was nevertheless struck, which caused him to fall against the headboard of the bed. She further witnessed her boyfriend repeatedly push a walker, while Joshua was seated in it, with such force that the baby's neck snapped backwards.
On February 3d, Linda took Joshua to a day-care center located on the campus of the high school she attended. A nurse at the center questioned Linda about bruises on Joshua's forehead. The mother claimed Joshua had bumped his head against his crib or a wall. In fact, Ryan had caused the bruising by head-butting the baby. For the next several days the mother kept Joshua out of the day-care center and paid a sitter to watch him in an attempt to keep the center from reporting her to the authorities.
Around the 3d of February, Linda left Joshua with Ryan while she went out to play basketball. During this babysitting episode, Ryan placed Joshua on his back and used his closed fists to repeatedly punch the baby in the chest.
*1724 Ryan admitted to the police that on or about February 4th he slapped Joshua 9 to 10 times on the left side of the face, causing the baby to suffer a black eye.
On February 11, the day-care center apparently contacted child protective services. That day, according to social worker and police reports, Joshua had multiple bruises on his face and abdomen. Doctors at Valley Medical Center examined the minor and reported that, in addition to the bruising, Joshua had sustained eight rib fractures. They diagnosed Joshua as suffering from battered child syndrome.
Both Linda and Ryan were arrested and detained at juvenile hall.
Based upon a consideration of the social study, the juvenile court referee found counts a-1, a-2 and e-1 true, and thus determined that the minor was a person described in section 300, subdivisions (a) and (e).
At the dispositional hearing in May, the department recommended, pursuant to section 361.5, subdivisions (b)(5) and (c), that the juvenile court deny the mother reunification services and set the case for a permanency planning hearing under section 366.26. To this end, the department introduced evidence intended to establish: (1) The provision of reunification services would not prevent Joshua's reabuse and (2) the absence of reunification services would not be detrimental because the child was not closely and positively attached to his mother.[3]
Gordon Cappelletty, a clinical psychologist, interviewed the mother in early April to determine the feasibility of reuniting her with Joshua. He reported Linda had suffered a number of emotional traumas as a child, which made her very vulnerable emotionally and produced strong needs for attention and affection from others. "These needs manifested themselves in a clinging dependency on the male figures in her life."
"When these needs are not met, which is likely to be much of the time, she will develop a great deal of anger, and resentment.... With or without the use of drugs, Ms. [H.]'s relationships are likely to be quite volatile and unstable.... Though she claimed in a very sincere manner that she was no longer interested in her former boyfriend, her sincerity at terminating the relationship with him is very questionable. At the least, she will probably *1725 enter into another relationship which is as violent as her previous relationship.
"... Ms. [H.]'s fear of being abandoned by her boyfriend over-rode her desire to protect her child."
Nevertheless, the psychologist wrote in his report:
"... Ms. [H.]'s chances to benefit from treatment are fair to good. She appears to be highly motivated, has good verbal skills, and is adequately able to reflect on herself and her behavior. The treatment plan that would best meet Ms. [H.]'s needs would involve a combination of psychotherapy, parenting classes, anger management, and assertiveness training. The assertiveness training is very important in order to break the cycle of dependency on others.
"Ms. [H.] will need treatment for a minimum of six to eight months before reunification with her son. Her chances for successfully completing treatment are better if she enters treatment as soon as possible following her release from Juvenile Hall. She is more likely to be highly motivated immediately after her release, and her level of motivation will inevitably decrease as the Juvenile Hall experience fades from her memory. Thus, it is highly suggested that Ms. [H.] begin counseling as soon as possible."
At the disposition hearing, Cappelletty testified about the importance of the mother's motivation to change the circumstances of her life. If she lacked such motivation, no amount of treatment would be successful in helping her overcome the psychological problems which led her to allow Joshua's abuse. If she were using drugs, it would greatly reduce the effect of counseling and call into question the degree of her motivation. It would also cause the psychologist to question her sincerity, since she had denied to him that she had used any drugs after becoming pregnant with Joshua. If the mother were using drugs, then Cappelletty believed it would be unlikely Joshua could return to her custody within a year's time and not suffer further abuse.
The department introduced evidence that the mother was at least a chronic abuser of alcohol, marijuana and KJ (apparently an acronym for "killer joint" or a marijuana cigarette laced with phencyclidine [PCP]). There was also evidence that around the time the mother was interviewed by Dr. Cappelletty she had twice ingested PCP. Further, there was evidence the mother had told a counselor she was going to continue her relationship with Ryan.
*1726 At the conclusion of the hearing, the court announced it would not order reunification services for the mother. It determined the evidence was insufficient to establish either a close relationship between Joshua and his mother or a likelihood that she could sufficiently reunify with Joshua so as to protect him from future abuse. The court then ordered that a section 366.26 hearing be set for 120 days from the disposition hearing.
The mother filed a timely notice of appeal, challenging the jurisdictional finding as well as the dispositional orders. Her appellate counsel thereafter filed a petition for writ of mandate and a request for a stay of the permanency planning proceedings. This court granted the stay request, ordered the department to respond to the petition on the merits, and subsequently set the matter for an order to show cause. In the interim, this court has further stayed the filing of the opening brief in the mother's appeal.

DISCUSSION

I. SUBSTANTIAL EVIDENCE
The mother argues there was insufficient evidence to support the section 300, subdivision (e) jurisdictional finding (subdivision (e) finding). She offers three alternative theories to support her contention, none of which has merit.
Section 300, subdivision (e) provides in pertinent part:
"Any minor who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:
".... .... .... .... .... .... ....
"(e) The minor is under the age of five and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the minor. For the purposes of this subdivision, `severe physical abuse' means any of the following: any single act of abuse which causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death; any single act of sexual abuse which causes significant bleeding, deep bruising, or significant external or internal swelling; or more than one act of physical abuse, each of *1727 which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness; or the willful, prolonged failure to provide adequate food. A minor may not be removed from the physical custody of his or her parent or guardian on the basis of a finding of severe physical abuse unless the probation officer has made an allegation of severe physical abuse pursuant to Section 332."
Under these provisions, therefore, the appropriate agency must establish the following elements in order to justify a subdivision (e) jurisdictional finding:
(1) there is a minor under the age of five;
(2) who has suffered severe physical abuse as defined in section 300, subdivision (e);
(3) by a parent or any person known to the parent if the parent knew or reasonably should have known that the person was physically abusing the minor.

A. Whether the mother personally inflicted severe physical abuse.

The mother initially maintains there was no evidence she personally inflicted severe physical abuse upon her infant son. There is no dispute over this point. Whether she personally caused Joshua to suffer severe physical abuse was not raised by the department as an issue in this case; the department did not attempt to prove a section 300, subdivision (e) allegation based on the mother's physical abuse of Joshua. Rather, the factual basis for the allegation in the petition was:
"Between on or about January 31, 1992 and February 11, 1992 said minor sustained injuries inflicted on him by said minor's mother's boyfriend. These injuries included but are not limited to bruises on the top of the head caused by head butts, bruising of the upper legs, bruising on the stomach and eight broken ribs. Said minor's mother, Linda [H.], was aware of the abuse being inflicted by Mr. [G.] but made no effort to intercede. Further, Ms. [H.] sought to hide the abuse from mandated reporters and sought no medical treatment for said minor's injuries."

B. Whether the mother's boyfriend inflicted severe physical abuse.

(1a) Second, mother contends there was insufficient evidence that the abuse inflicted by her boyfriend, Ryan, was severe. She concedes Joshua's *1728 fractured ribs might be described, in general terms, as severe. Nevertheless, she argues this injury did not satisfy the statutory definition of severe physical abuse.
(2) On review this court determines whether, viewed in the light most favorable to the judgment, there is substantial evidence to support the juvenile court's finding. (In re Albert B. (1989) 215 Cal. App.3d 361, 375 [263 Cal. Rptr. 694].) All conflicts must be resolved in favor of the respondent, and we must indulge in all reasonable inferences which support the finding. (Ibid.)
(1b) As previously stated, section 300, subdivision (e) describes severe physical abuse as:
"... any single act of abuse which causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death; any single act of sexual abuse which causes significant bleeding, deep bruising, or significant external or internal swelling; or more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness." (Italics added.)
According to the mother, Joshua suffered the eight rib fractures as a result of a single act, and there was no evidence before the juvenile court that, if left untreated, these injuries would cause permanent physical disfigurement, disability or death. Thus, in her estimation the evidence did not prove severe physical abuse as defined in subdivision (e).
The flaw in the mother's argument is that it ignores the alternate measure of severe physical abuse set out in section 300, subdivision (e); that is, "more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness." (§ 300, subd. (e).) In our view, there was evidence before the juvenile court at the dispositional hearing to satisfy this statutory standard.
Ryan admitted he lost his temper on one occasion and head-butted the left side of Joshua's skull. This incredible brutality left marks and bruises on the baby's forehead, as well as on the left side of his head. The act apparently occurred on or before February 3; the bruising was so severe that the mother did not take Joshua to the day-care center between the 3d and the 7th of February for fear someone would see the head bruises and report them to the *1729 authorities. Although there was no explicit medical testimony that the bruises were "deep," the requisite severity may be inferred from the fact that the injuries were still apparent during the infant's February 11th medical examination, at least eight days later.
On another occasion, this time on the 4th of February, Ryan slapped the baby nine or ten times on the left side of his face. As a result, Joshua suffered a black eye and a mark beneath it. As before, the evidence of bruising persisted; it was still visible 10 days later, according to a doctor's report.
Finally, Ryan admitted he repeatedly used his closed fists to hit the infant in his chest and abdomen. It was apparently during this appalling, inhuman attack that the baby sustained the eight fractured ribs.
Thus, the record contains facts which, directly and circumstantially, support a conclusion that the mother's boyfriend committed "more than one act of physical abuse" on the child, "each of which cause[d]" either "deep bruising" or "bone fracture." There was therefore sufficient evidence to support a finding of severe physical abuse as defined in section 300, subdivision (e).

C. Whether the mother must be aware of the severity of the physical abuse

(3) Mother's last challenge to the subdivision (e) jurisdictional finding is the claim there was no evidence she was aware of the severity of the abuse which her boyfriend inflicted upon Joshua. Again, however, she ignores certain language in the statute.
When, as here, an infant suffers severe physical abuse at the hands of someone other than a parent, the minor is subject to juvenile court jurisdiction if the abuser was known by the parent and the parent knew or reasonably should have known that the abusive person "was physically abusing the minor." (§ 300, subd. (e).) The subdivision does not require the parent's actual or constructive knowledge that the minor in fact suffered severe physical abuse within the statutory definition. Indeed, several of the listed injuries, such as bleeding (internal), internal swelling, and bone fracture, may not be visible; they may be discovered only after medical examination or testing. We do not believe the Legislature intended to so limit the reach of the statute.
*1730 Given the mother's admission that she knew Ryan was abusing Joshua, there was sufficient evidence in this regard to support the jurisdictional finding.

II. SECTION 361.5, SUBDIVISION (b)(5)
Next, the mother complains the juvenile court erroneously refused her the benefit of reunification services. She offers a variety of arguments to support her claim. We find no error.
The juvenile court denied the mother reunification services based on the language of section 361.5, subdivision (b)(5) and subdivision (c); these subdivisions provide:
"(b) Reunification services need not be provided to a parent described in this subdivision when the court finds, by clear and convincing evidence, any of the following:
".... .... .... .... .... .... ....
"(5) That the minor was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent.
"(c) In deciding whether to order reunification in any case in which this section applies, the court shall hold a dispositional hearing. The probation officer shall prepare a report which discusses whether reunification services shall be provided....
"When paragraph (3), (4), or (5), inclusive, of subdivision (b) is applicable, the court shall not order reunification unless it finds that, based on competent testimony, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent. The probation officer shall investigate the circumstances leading to the removal of the minor and advise the court whether there are circumstances which indicate that reunification is likely to be successful or unsuccessful and whether failure to order reunification is likely to be detrimental to the child.
"The failure of the parent to respond to previous services, the fact that the child was abused while the parent was under the influence of drugs or *1731 alcohol, a past history of violent behavior, or testimony by a competent professional that the parent's behavior is unlikely to be changed by services are among the factors indicating that reunification services are unlikely to be successful. The fact that a parent or guardian is no longer living with an individual who severely abused the minor may be considered in deciding that reunification services are likely to be successful, provided that the court shall consider any pattern of behavior on the part of the parent that has exposed the child to repeated abuse."

A. "Because of the Conduct of That Parent"

(4) The mother contends section 361.5, subdivision (b)(5) was inapplicable in her case and should not have been relied upon by the juvenile court, since the subdivision (e) jurisdictional finding was based not on her conduct but rather on the conduct of her boyfriend. According to the mother, the phrase "because of the conduct of that parent" in subdivision (b)(5) of section 361.5 limits the applicability of the subdivision to those situations where the parent is the person who actually inflicts the severe physical abuse on the child. Since this was indisputably not the case here, the mother asserts she was entitled to, and should have been afforded, reunification services. Alternatively, she claims the language of section 361.5, subdivision (b)(5) is impermissibly vague.
Construing section 361.5 in its entirety, as we must (Moyer v. Workmen's Comp. Appeals Bd. (1973) 10 Cal.3d 222, 230 [110 Cal. Rptr. 144, 514 P.2d 1224]), we do not find subdivision (b)(5) of the statute to be vague. Rather, we find it was properly applied to the mother in the circumstances disclosed by the record before the juvenile court.
Subdivision (c) of section 361.5 explains how the court should proceed if it makes an affirmative finding under subdivision (b)(5). (See In re Rebecca H. (1991) 227 Cal. App.3d 825, 843 [278 Cal. Rptr. 185].) In such a case, the court may not order the provision of reunification services unless it finds:
"those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent."
Subdivision (c) also provides explicit guidance for the juvenile court in determining whether reunification is likely to prevent reabuse. In this connection, it says:
*1732 "The fact that a parent or guardian is no longer living with an individual who severely abused the minor may be considered in deciding that reunification services are likely to be successful...."
This provision in section 361.5, subdivision (c) confirms that the Legislature intended subdivision (b)(5) of section 361.5 to apply to the parent who, knowing the actual abuser, knows or reasonably should have known that the other person was physically mistreating the child, as well as to the parent who personally abuses his or her child. Were it otherwise, as the mother proposes, this particular statutory language would be meaningless, for there would be no reason for the court to consider whether the parent was currently living with a third person if the parent was the abuser.
Moreover, the phrase "because of the conduct of that parent" is not itself meaningless or inconsistent with our interpretation of subdivision (b)(5).[4] A minor may be subject to the juvenile court's jurisdiction under section 300, subdivision (e) because of the conduct of only one parent. It may well be that the minor's other parent was in no way involved, either as the abuser or as one with the requisite knowledge of abuse by another. There is no reason in this type of situation to deny the other, or innocent, parent reunification services. The inclusion of the phrase "because of the conduct of that parent" suggests the Legislature was cognizant of the possibility of such a scenario when it identified in subdivision (b)(5) of section 361.5 one of those few situations when the juvenile court does not have to order reunification services.
We believe our construction of section 361.5, subdivision (b)(5) gives effect to, and harmonizes, all parts of section 361.5 (Moyer v. Workmen's Comp. Appeals Bd., supra, 10 Cal.3d at p. 230), and carries out our obligation to interpret a statute, when reasonably possible, in such a manner as to render the enactment valid and constitutional rather than invalid and unconstitutional. (People v. Amor (1974) 12 Cal.3d 20, 30 [114 Cal. Rptr. 765, 523 P.2d 1173].)
For the reasons expressed, we find no basis for the mother's assertion the juvenile court improperly applied section 361, subdivision (b)(5) to her or that the statute is unlawfully vague.

*1733 II. B.-E., III., IV.[*]
.... .... .... .... .... .... .... .

DISPOSITION
The petition for writ of mandate is denied. The appeal from the disposition order is dismissed. The order granting a stay of the section 366.26 hearing is vacated; the stay of such hearing is dissolved.
Ardaiz, Acting P.J., and Vartabedian, J., concurred.
NOTES
[] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts IIB through E, III and IV.
[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[2] Because the mother's claims on review do not relate to the section 300, subdivisions (a) and (g) allegations, the facts relating to these allegations are not discussed.
[3] The mother does not contend Joshua was closely and positively attached to her. Thus, the evidence on this issue has not been summarized.
[4] The mother argues that, if the Legislature intended subdivision (b)(5) to apply when the parent is the actual abuser as well as when the parent is not, this phrase would not have been inserted into the subdivision; a simple reference to section 300, subdivision (e) in section 361, subdivision (b)(5) would have sufficed.
[*] See footnote, ante, page 1718.