Filed 8/27/15  H. v. Super. Ct. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MA.H., | |
| Petitioner, | G051997 |
| v. | (Super. Ct. Nos. DP024980, DP024981, DP025118) |
| THE SUPERIOR COURT OF ORANGE COUNTY, | |
| Respondent; | O P I N I O N |
| ORANGE COUNTY SOCIAL SERVICES AGENCY et al., | |
| Real Parties in Interest. | |
| M.O., | |
| Petitioner, | G052025 |
| v. | |
| THE SUPERIOR COURT OF ORANGE COUNTY, | |
| Respondent; | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY et al., | |
| Real Parties in Interest. | |

Original proceedings; petitions for a writ of mandate to challenge an order of the Superior Court of Orange County, Dennis J. Keough, Judge. Petitions denied.

Juvenile Defenders, Donna P. Chirco and David Bell for Petitioner in G051997 and for Real Party in Interest in G052025, Ma.H.

Frank Ospino, Public Defender, Laura J. Jose, Assistant Public Defender, Hong T. L. Nguyen and Dennis M. Nolan, Deputy Public Defenders, for Petitioner in G052025 and for Real Party in Interest in G051997, M.O.

No appearance for Respondent.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Law Office of Peggy Oppedahl and Peggy Oppedahl for Real Parties in Interest R.H., J.H., and Mi.H.

\* \* \*


INTRODUCTION

Ma.H. (father) and M.O. (mother) are the parents of four minor children, who currently range in age from 10 and a half to one. After a lengthy jurisdiction and disposition hearing, the juvenile court found that mother had caused severe physical harm to one of the children, and that father reasonably should have known of the harm. The court removed all four children from mother and father's custody, and denied them reunification services as to the three youngest children. (The court ordered reunification services for both mother and father as to the oldest child.)

Mother and father filed separate petitions for a writ of mandate challenging the denial of reunification services; father seeks reunification services as to the three

youngest children, while mother seeks reunification services as to only one of the children, now three-and-a-half-year-old R.H.

Substantial evidence supports the juvenile court's findings that father was an offending parent, pursuant to Welfare and Institutions Code section 361.5, subdivision (b)(5), and that reunification services should not be provided to him. (All further statutory references are to the Welfare and Institutions Code.) Substantial evidence also supports the juvenile court's findings that mother was not entitled to reunification services pursuant to section 361.5, subdivision (b)(5) and (6), and that R.H.'s best interests would not be served by nevertheless ordering services. Therefore, both petitions are denied.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

In May 2014, then 14-month-old J.H. was brought to the hospital by mother, who reported J.H. had suffered a seizure and fallen off the couch. An examination revealed the following injuries: right orbital fracture; left posterior hematoma; old rib fractures; bruises to the back, chest, arms, and legs, all in different stages of healing; abrasions to the right nostril and under the nose; large red bump on the forehead; dark, circular spot on the upper right cheek; laceration and ulcer on the tongue; distal left tibia fracture; and right humerus fracture. J.H. was also dehydrated and had a very low weight; he was diagnosed with failure to thrive. Mother, who had been J.H.'s primary caregiver, could not provide an explanation for several of J.H.'s injuries, and her explanations for some of the others were determined by the hospital staff to be inconsistent with his injuries.

J.H. was taken into protective custody, along with his siblings, Mc.H. and R.H., who were then nine and two years old, respectively. A juvenile dependency petition was filed by the Orange County Social Services Agency (SSA), alleging that J.H., Mc.H., and R.H. came within the juvenile court's jurisdiction pursuant to

3

section 300, subdivisions (a) (serious physical harm) and (b) (failure to protect). The petition alleged that J.H. also came within the court's jurisdiction pursuant to section 300, subdivision (e) (severe physical abuse of a child under five years of age). In addition to the allegations of injury described *ante*, the petition alleged (1) the injuries and detrimental condition sustained by J.H. were of a nature that would not ordinarily be sustained except as a result of unreasonable or neglectful acts or omissions of the child's caregiver; (2) J.H. had previously suffered seizures for which mother had sought treatment from J.H.'s pediatrician, but had failed to follow through with a neurologist to determine the cause of the seizures; (3) mother had a past history of mental health issues, including an attempted suicide when she was a minor; (4) father had a past history of abuse of marijuana; and (5) father had a criminal history.

About a month after J.H. and his siblings were taken into protective custody, mother gave birth to Mi.H. SSA filed a juvenile dependency petition alleging Mi.H. came within the juvenile court's jurisdiction pursuant to section 300, subdivisions (a), (b), and (j) (abuse of sibling), by virtue of the same allegations supporting the previous dependency petition.

In August 2014, an amended petition was filed, in which all four children were alleged to come within the juvenile court's jurisdiction pursuant to section 300, subdivisions (a), (b), (e), and (i) (cruelty).

A joint hearing on jurisdiction and disposition for all four children began in January 2015, and continued over multiple days through May 2015.

After the jurisdiction/disposition hearing, the juvenile court amended the petition by interlineation to conform to proof, and found the allegations of the petition, as amended, true by a preponderance of the evidence. As specific to the issues raised by father's and mother's writ petitions, the court found by clear and convincing evidence

4

that (1) J.H. was "purposely deprived of food for extended periods of time"; (2) J.H. was under five years of age and "suffered se[ver]e physical abuse by a parent, specifically mother"; (3) father did not directly cause the injuries suffered by J.H.; (4) father knew that J.H. "had a substantial and sustained weight loss that required medical attention, and he failed to provide that attention," and father should have known that J.H. was being deprived of food; (5) J.H. "was bitten repetitively by mother . . . on more than one occasion"; (6) mother's conduct caused J.H.'s rib, humerus, and tibia fractures; and (7) father reasonably should have known, based on the injuries to J.H.'s head, that J.H. was being physically abused by mother.

Pursuant to section 360, subdivision (d), the court declared all four children to be dependents of the juvenile court. Although only J.H. had been the subject of abuse, the court found that all the children were at risk of future abuse. The court further found, by clear and convincing evidence, that there was a substantial danger to the children's health, safety, protection, or physical or emotional well-being if they were to be returned to mother and father's care and custody, and that it was therefore in their best interests to be placed in the custody of SSA.

As to Mc.H., the juvenile court ordered that family reunification services be provided to mother and father. As to R.H., J.H., and Mi.H., however, the court found, pursuant to section 361.5, subdivision (b)(5), that reunification services need not be provided to mother and father; the court also found that services need not be provided to mother pursuant to section 361.5, subdivision (b)(6).

Both mother and father filed timely notices of intent to file a writ petition.[1]

---

[1]  Father filed a notice of appeal, but this court granted father's request to treat the notice of appeal as a notice of intent to file a writ petition.

DISCUSSION

I.

*THE JUVENILE COURT DID NOT ERR IN DENYING FATHER
REUNIFICATION SERVICES AS TO R.H., J.H., AND Mi.H.*

A.

*Father Was an Offending Parent.*

"Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] . . . That the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent or guardian." (§ 361.5, subd. (b)(5).)

Father argues that he is not an offending parent within the meaning of section 361.5, subdivision (b)(5). Father challenges the juvenile court's finding that he reasonably should have known that mother was physically abusing J.H. by failing to feed him.[2] "[T]he Legislature intended subdivision (b)(5) of section 361.5 to apply to the parent who, knowing the actual abuser, knows or reasonably should have known that the other person was physically mistreating the child, as well as to the parent who personally abuses his or her child." (*In re Joshua H.* (1993) 13 Cal.App.4th 1718, 1732.)

Father claimed J.H. had only been severely undernourished for two to four weeks before he was detained. However, J.H.'s pediatrician noted that J.H. had been

_____

[2] The court did not find that father actually knew J.H. was being deprived of food. "[F]ather . . . should reasonably have known that J[.H.] was being physically abused by mother; and specifically, the child was subjected to a willful and prolonged failure to provide adequate food. [¶] The court does not find that father actually knew that the child was being deprived of food, but he should have known; that the father knew that the child had a substantial and sustained weight loss that required medical attention, and he failed to provide that attention, and he is accordingly charged with the knowledge that such medical attention was not disclosed."

gaining weight until January 31, 2014, but that he had lost a significant amount of weight by his checkup appointment on April 14, 2014, which would not happen "with somebody who has a very good appetite." By J.H.'s appointment on May 14, 2014, the pediatrician was so concerned about J.H.'s weight loss that he sent him directly to the hospital.

Father contended that he had no reason to know J.H. was not being fed because father witnessed J.H. eat large amounts of food voraciously. But father also noticed J.H. was "very thin and very weak and frail" and that he seemed to lack the will to live. Witnessing J.H. eat voraciously while physically and mentally wasting away, father reasonably should have known of the harm to J.H. While mother was the primary caregiver, father acknowledged that he helped mother with the children, had breakfast with them every day, and slept with R.H. and J.H., and that the family spent time together, all of which would establish father had enough contact with J.H. to be aware of his sudden, dramatic weight loss.

While other service providers—a physical therapist, cardiologist, and public health nurse—did not express concern regarding J.H.'s weight, those providers did not see J.H. on a regular basis after January 31, 2014, and were not in a position to notice that J.H.'s weight was dropping.

There was substantial evidence to support the juvenile court's finding that father was an offending parent because he was aware of J.H.'s significant and sudden loss of weight and reasonably should have known mother was abusing J.H. by failing to feed him, but failed to either take action or seek medical attention for J.H. in a timely fashion.

B.

*Father Did Not Establish That Failure to Provide Reunification Services to Him Would Be Detrimental to R.H., J.H., and Mi.H.*

After the juvenile court found that reunification services were not required for father under section 361.5, subdivision (b)(5), it could not order such services unless it made further findings that the services would benefit R.H., J.H., and Mi.H. "[T]he

7

court shall not order reunification in any situation described in paragraph (5) of subdivision (b) unless it finds that, based on competent testimony, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent. The social worker shall investigate the circumstances leading to the removal of the child and advise the court whether there are circumstances that indicate that reunification is likely to be successful or unsuccessful and whether failure to order reunification is likely to be detrimental to the child. [¶] The failure of the parent to respond to previous services, the fact that the child was abused while the parent was under the influence of drugs or alcohol, a past history of violent behavior, or testimony by a competent professional that the parent's behavior is unlikely to be changed by services are among the factors indicating that reunification services are unlikely to be successful. The fact that a parent or guardian is no longer living with an individual who severely abused the child may be considered in deciding that reunification services are likely to be successful, provided that the court shall consider any pattern of behavior on the part of the parent that has exposed the child to repeated abuse." (§ 361.5, subd. (c).)

Father bears the burden of proving reunification services should have been provided, despite the finding that he fell within section 361.5, subdivision (b)(5). "[O]nce SSA proves by clear and convincing evidence that a dependent minor falls under subdivision (e) of section 300, the general rule favoring reunification services no longer applies; it is replaced by a legislative assumption that offering services would be an unwise use of governmental resources. If the court then chooses to offer services, it must make a finding that they are likely to prevent reabuse of the child, and this finding must be supported by substantial evidence. While SSA has the statutory duty to investigate and present the court with information about the prognosis for a successful reunification, it is not required to prove the services will be unsuccessful." (*Raymond C. v. Superior Court* (1997) 55 Cal.App.4th 159, 164.)

Throughout the dependency period, father missed numerous drug tests, and had many other tests that were positive for amphetamines and/or methamphetamines. Although father participated in parenting classes, he failed to sign up for individual counseling and his therapy referral was terminated.

Father continued to deny that mother had injured J.H. or posed a danger to any of the children. At the jurisdiction/disposition hearing, father testified as follows:

"Q. Mr. H[.], you have been informed that J[.H.] presented with two rib fractures on May 14th at the hospital.

"A. Yes, yes, that's true.

"Q. Okay. And did you do anything to break those ribs?

"A. No.

"Q. Okay. And so you have testified that only you and the mom had care of this child at all times, correct?

"A. Yes, yes.

"Q. So if you didn't break the ribs, how do you think they got broken?

"A. I didn't do it. Mom didn't do it. And I know like I explained to you who my wife is and who [mother] is, and she, the children—she's always kept them clean and neat. She's never struck them. She's always cared for them. She has never struck one of our children."

Father further testified:

"Q. As you sit here today you trust mom with your children while you go to work, right?

"A. Yes."

Additionally, father testified:

"Q. You have never seen [mother] hit any of the children, have you?

"A. No. I have never seen her and she's never hit them.

9

"Q. In all these years that you [have] been with her and the children, you have never seen her abuse any of the kids, have you? [¶] . . . [¶]

"The witness (through the interpreter): No. I've never seen her and she's never hit them. I know from the first child . . . how she was with him. . . . [W]e waited seven years to have more children. With M[c.H.] she was very special. Then came R[.H.], and same. And J[.H.] as well. . . ."

Finally, father testified:

"Q. In all these years being with [mother] and the children, you have never seen [mother] starve any of the kids, have you?

"A. No, not at all.

"Q. In all these years you [have] been with [mother], you have never seen [mother] deprive any of the children, including J[.H.], of food, have you?

"A. No.

"Q. Never seen her deprive the children of clothing, including J[.H.]?

"A. No, not at all. They were always well fed and well dressed, well combed. . . ."

At the time of the jurisdiction/disposition hearing, mother and father were not living together, but were still in a relationship. Father testified that he would not live with mother if that is what it would take to have his children returned to him.

On the other side of the coin, R.H., J.H., and Mi.H. were all doing well in the care and custody of the concurrent planning foster parents. None of the children displayed an unusually close bond with father, and no bonding studies were offered to the juvenile court.

Father did not show that the failure to provide reunification services to him would be detrimental to R.H., J.H., and Mi.H.

## II.

### *THE JUVENILE COURT DID NOT ERR IN DENYING MOTHER REUNIFICATION SERVICES AS TO R.H.*

#### A.

*The Juvenile Court Did Not Err in Finding Reunification Services Should Not Be Provided to Mother Pursuant to Section 361.5, Subdivision (b)(5).*

As with father, the juvenile court denied reunification services to mother as to R.H., J.H., and Mi.H., pursuant to section 361.5, subdivision (b)(5).  Mother argues that the court erred in denying reunification services because R.H. was closely and positively attached to mother, pursuant to section 361.5, subdivision (c).  (Mother does not argue that she should have been granted reunification services as to J.H. or Mi.H.)

There was evidence that R.H. and mother had a positive bond.  At many visits, R.H. would cry and ask to go home with mother.  R.H. also cried after visits with mother.  However, their bond was not exceptionally close.  The foster father testified that while it originally took about 10 minutes for R.H. to calm down and stop crying after a visit, she was later able to separate from mother after visits without crying or becoming emotional.  The social worker testified that while R.H. definitely had a bond with mother and father, terminating R.H.'s relationship with mother would not be detrimental because R.H. was "able to form a bond with the caretakers that she's with now or other people."  By March 2015, R.H. was referring to the foster mother as "mommy."

The evidence presented to the juvenile court was not sufficient to overcome the presumption against providing reunification services to mother as to R.H.

#### B.

*The Juvenile Court Did Not Err in Finding Reunification Services Should Not Be Provided to Mother Pursuant to Section 361.5, Subdivision (b)(6).*

The juvenile court also denied reunification services to mother pursuant to section 361.5, subdivision (b)(6), which provides:  "Reunification services need not be

11

provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] (6) That the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of severe sexual abuse or the infliction of severe physical harm to the child, a sibling, or a half sibling by a parent or guardian, as defined in this subdivision, and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian. [¶] . . . [¶] A finding of the infliction of severe physical harm, for the purposes of this subdivision, may be based on, but is not limited to, deliberate and serious injury inflicted to or on a child's body or the body of a sibling or half sibling of the child by an act or omission of the parent or guardian, or of another individual or animal with the consent of the parent or guardian; deliberate and torturous confinement of the child, sibling, or half sibling in a closed space; or any other torturous act or omission that would be reasonably understood to cause serious emotional damage." Mother does not argue that there was not substantial evidence to support the court's finding that she inflicted severe physical harm on J.H.; the evidence of mother's infliction of harm on J.H. was overwhelming.

Mother argues, however, that the court should have exercised its discretion to order reunification services for her and R.H. When a no-reunification-services finding is made under subdivision (b)(6), as opposed to subdivision (b)(5), of section 361.5, the standard to nevertheless order services is higher. "The court shall not order reunification for a parent or guardian described in paragraph . . . (6) . . . of subdivision (b) unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c).)

The factors the court must consider in making the determination are set forth in subdivision (i) of section 361.5: "In determining whether reunification services will benefit the child pursuant to paragraph (6) . . . of subdivision (b), the court shall consider any information it deems relevant, including the following factors: [¶] (1) The

12

specific act or omission comprising the severe sexual abuse or the severe physical harm inflicted on the child or the child's sibling or half sibling. [¶] (2) The circumstances under which the abuse or harm was inflicted on the child or the child's sibling or half sibling. [¶] (3) The severity of the emotional trauma suffered by the child or the child's sibling or half sibling. [¶] (4) Any history of abuse of other children by the offending parent or guardian. [¶] (5) The likelihood that the child may be safely returned to the care of the offending parent or guardian within 12 months with no continuing supervision. [¶] (6) Whether or not the child desires to be reunified with the offending parent or guardian."

Having considered all relevant factors, the court found there was not clear and convincing evidence that reunification with mother was in the best interests of R.H. The court's findings were supported by substantial evidence. As mother admits, the acts comprising the abuse of J.H. were serious and severe, required intentional acts and omissions, and continued over an extended period of time. Although J.H. was too young to verbalize emotional trauma, the court was able to reasonably infer the biting would have caused such trauma. Further, the deprivation of food caused sufficient trauma that J.H. responded by eating ravenously to the point of choking when he was given food. The court stated that, given mother's "deep-seated issues that led to this," there was little likelihood R.H. could be returned to mother within 12 months without continuing supervision. The court noted that the lack of any history of abuse of the children, other than J.H., favored mother. The court did not make a specific finding regarding R.H.'s desire to be reunified with mother.

Substantial evidence supported the court's finding that reunification services would not be in R.H.'s best interests.

13

## C.

*The Denial of Reunification Services to Mother Is Not Inconsistent with the Legislative Command to Preserve the Sibling Relationship Between R.H. and Mc.H.*

Mother also argues that offering reunification services to her would preserve the sibling bond between R.H. and Mc.H.  The social services agency's report, prepared for the disposition hearing in a juvenile dependency matter, must address "[t]he appropriateness of developing or maintaining the sibling relationships" and "[t]he impact of the sibling relationships on the child's placement and planning for legal permanence." (§ 358.1, subd. (d)(1)(B) & (E).)

From detention to January 2015, R.H. and Mc.H. had been placed together; in January 2015, R.H. was moved to the home of the concurrent planning foster parents, where J.H. and Mi.H. had been placed.  R.H. and Mc.H. were very attached to each other. Mother argues that given the close relationship between R.H. and Mc.H., mother should have been given reunification services with R.H., which would maintain the relationship between R.H. and Mc.H. (§ 16002, subd. (b)) and serve their best interests (§ 361.5, subd. (c)).

Even after R.H. and Mc.H. were placed in different homes, they continued to see each other regularly at weekly visitation.  The concurrent planning foster parents agreed that it was important to maintain the relationship between R.H., J.H., and Mi.H. (all of whom are now placed together), and Mc.H. (who remains placed with his maternal grandmother, and for whom mother and father have been given reunification services). They had also committed to ensuring visits with Mc.H. if the foster parents ultimately adopted the other three children.

The court specifically noted that it had considered the sibling relationships as part of its order on disposition:  "The other thing the court wants to touch on that there's reference to R[.H.] and, you know, her relationship to her older brother, and then the relationship of J[.H.] to M[c.H.] because of the shared disability, as well as mother.

14

[¶ *The court has taken those into consideration in making its findings. . . . [¶]* The court would note the court is satisfied that there will be, visitation will be facilitated between M[c.H.] and his siblings." (Italics added.)

Mother failed to establish that R.H.'s sibling relationship with Mc.H. would be negatively impacted by denying reunification services as to R.H.

DISPOSITION

The petitions for a writ of mandate, pursuant to California Rules of Court, rule 8.450, are denied.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.

15