Filed 6/27/16  In re Julian Q. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re JULIAN Q., a Person Coming Under the Juvenile Court Law. | B265942 |
| | (Los Angeles County Super. Ct. No. DK07620) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Appellant, v. NICOLE Q., Defendant and Appellant. | |

        APPEAL from an order of the Superior Court of Los Angeles County, Annabelle Cortez, Judge.  Affirmed.

        Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, and Stephen D. Watson, Deputy County Counsel, for Plaintiff and Appellant.

        Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

_____

Nicole Q. appeals from the juvenile court's order declaring her three children, Isis (then four months old), Adrian (two years old) and Julian (six years old), dependents of the juvenile court.  Nicole contends the evidence was insufficient to sustain the court's jurisdiction finding pursuant to Welfare and Institutions Code section 300, subdivision (e),[1] she knew or reasonably should have known Isis was being physically abused by her father, Ramon B.[2]  The Los Angeles County Department of Children and Family Services (Department) has cross-appealed, contending the court erred in dismissing the allegation Nicole had failed to obtain appropriate evaluation and treatment of Adrian's emotional and behavioral problems.  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The Initiation of Dependency Proceedings, Detention and the Amended Petition*

On September 21, 2014 Nicole, then 24 years old, called the police emergency number when Isis began having a seizure.  Isis was taken to the hospital where it was discovered she had two subdural hematomas, a new one and an older one of undetermined age, but no external injuries.  Although Nicole and Ramon denied injuring her, the emergency room physician opined the injuries were most likely caused by physical abuse.  Isis was transferred to Miller Children's Hospital because she required a higher level of care.

Isis, Adrian and Julian were detained in protective custody.  On September 30, 2014 the Department filed a petition under section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), (e) (severe physical abuse) and (j) (abuse of sibling).  The Department alleged Isis's injuries would not ordinarily occur except as a result of deliberate, unreasonable and neglectful acts by Nicole and Ramon, who had care, custody and control of her; Ramon had a history of illicit drug and alcohol abuse and was a current abuser of cocaine, marijuana and alcohol, substance abuse that endangered Isis;

---

[1]     Further statutory references are to this code.

[2]     Neither Ramon nor the fathers of Adrian and Julian are parties to this appeal.

Nicole and Ramon had failed to seek timely medical care for Isis; and the abuse of Isis and failure to seek timely medical care for her injuries placed her siblings at risk of harm.

As described in a report prepared for the detention hearing, Nicole and the children had recently moved back to California from Oregon, where Isis was born, so the family could be closer to Ramon. In the week prior to the seizure Nicole, Ramon and the children were staying in a motel because Nicole's maternal great-aunt, Paula C., with whom she and the children had been living, would not permit Ramon to stay in her home. The five of them were sleeping on one king-size bed.

Although Nicole was Isis's primary caregiver, Ramon occasionally cared for the infant during which time mishaps had occurred. According to Nicole, four days before the seizure Nicole left Isis on the bed with Ramon, who was sleeping, when she took Julian to school. Ramon said he had accidentally hit Isis in the mouth with his elbow when he reached for his ringing telephone. Although Isis had cried, she was not crying when Nicole returned home and did not appear injured. When Nicole took Julian to school two days later, Adrian got on the bed with Ramon and Isis and accidentally kicked Isis below her eye during a tantrum when Adrian could not find Nicole. Isis, however, did not sustain any bruises or marks. With respect to other potential causes of injury, Nicole, Ramon and Julian reported Isis had been hit on the back of the head by the bathroom door three nights before the seizure. Unbeknownst to Ramon, Nicole was holding Isis in a harness and had been standing behind the door when Ramon opened it from inside the bathroom.

Nicole reported Isis had not been eating or sleeping normally beginning about three days before the seizure, but she believed the infant was teething because she had been fussing and biting her hand. Ramon reported Isis's demeanor for the three or four days before the seizure had scared him—she was not eating correctly or smiling like she used to, was "acting all drowsy" and "her eyes looked drowsy when she was awake." Ramon told Nicole, but she did not respond. On the day of the incident, according to Nicole, Isis appeared to be slouching when Ramon burped her. Nicole grabbed Isis and

realized she was gasping for air. Her limbs locked, head tilted back and eyes rolled back. After this happened four times, they called the police emergency operator.

Dr. Sandra Murray, Isis's attending physician at Miller Children's & Women's Hospital, informed the Department she believed Isis's two subdural hematomas were not accidentally caused and neither hitting the infant in the head with the door or Adrian kicking her were consistent with the injuries, one of which was more than a week or two old.

With respect to Adrian, the maternal great-aunt with whom the children had been placed, Rocio V., reported he hit his head when he was frustrated or told no. She also described him as aggressive and noted "he can be a little bully." Both Nicole and Ramon described Adrian as aggressive and jealous of Isis. Ramon said Adrian would hit Isis when he could. Julian reported Adrian hit and bit Isis.

Ramon, then 23 years old, admitted he had used marijuana and cocaine recreationally since high school, but contended he had stopped three to four months earlier at Nicole's request. He also stopped drinking alcohol one month before Isis's seizure. He said he and Nicole were working on their relationship and "want[ed] to have something stable to provide for their kids," but he at that time did not have a job or stable housing.

At the detention hearing on September 30, 2014 the court found a prima facie showing had been made the children came within section 300 and there was a substantial danger to their physical or emotional well-being and no reasonable means to protect them without removing them from Nicole's and Ramon's custody. Adrian and Julian were placed in Rocio V.'s temporary care and a hospital hold was placed on Isis. (Isis was released to Rocio V. on October 3, 2014.) The court granted Nicole monitored visits.

On October 24, 2014 the Department filed a first amended petition, adding an allegation that Nicole had failed to obtain appropriate evaluation and treatment of Adrian's emotional and behavioral problems—head butting himself, aggression toward Isis and others—and had failed to obtain all required immunizations for him. (§ 300, subd. (b).)

4

## 2. *The Contested Jurisdiction Hearing*

### a. *Jurisdiction and disposition report; last minute information; conflicting expert opinions*

The Department's October 23, 2014 report for the jurisdiction and disposition hearing contained much of the same information as its report for the detention hearing. It added Nicole's explanation why Adrian was behind on his immunizations: She had to reapply for Medi-Cal benefits after moving back to California and was waiting for a referral. Additionally, the report contained a statement from maternal great-aunt Paula C. that she had advised Nicole to have Adrian evaluated. Paula C. stated, "'[Adrian] would get upset whenever [Nicole] would leave and he would slam his head against things, like the wall or floor. He uses his head like a weapon. She told me that he had been doing that awhile and he had busted her lip open. That is not normal[,] and I was concerned for him and I had to remind Nicole many times to watch him and to be more vigilant.'" Paula C. further stated Nicole's own upbringing lacked stability and she did not have the experience to know what to do, but Paula C. never had any other concerns about the children. Rocio V. and other family members described Nicole as lacking initiative, expecting other people to fix her problems. The Department recommended no family reunification services be provided for Ramon or Nicole.

In a last minute information submitted for the November 13, 2014 pretrial setting hearing, the Department summarized updated information obtained from Dr. Murray. The older subdural hematoma (that is, the chronic injury), "which was more likely to be more than a week old and maybe more than a month or more[,] had to have been caused by an impact or injury which caused the brain to bounce around the inside of the skull and tear the blood vessels. . . . [¶] . . . [¶] [W]hile the acute (new) injury could have been caused by the bathroom door hitting the infant's head, this injury normally would not cause bleeding in the brain. However, because there was a previous (chronic) injury that had not been attended to, the new injury (the door hitting the infant's head) caused a re-bleed into those chronic subdural hematomas."

In a letter dated January 2, 2015, Dr. Perry Lubens, a pediatric neurologist, opined Isis's injuries were more likely caused by her enlarged head circumference at birth, which can predispose the infant to hemorrhage into the resulting large subdural spaces incidental to the normal range of handling, rather than abusive head trauma. Similarly, in a January 24, 2015 letter Dr. Ronald Gabriel stated there was no compelling medical evidence to support the diagnosis of nonaccidental trauma. Based on the medical records, Dr. Gabriel described Isis's delivery as traumatic due to the abnormally large size of Isis's head, further complicated by her shoulders becoming trapped after delivery of the head.

In a last minute information for the court dated April 1, 2015 the Department reported Julian said he had been choked and shaken by Ramon and Nicole called out to Ramon to stop. Nicole denied knowledge of the incident, but said Ramon had once punched a wall and television set when he was mad at his mother. Ramon denied he shook or choked Julian. Although a referral had been generated, it was closed as inconclusive because Julian did not show any signs of injury and the children were stable in Rocio V.'s home.

b. *The hearing*

The contested hearing, which had been continued several times, commenced on April 6, 2015. Dr. Murray, deemed an expert in board-certified child abuse pediatrics and general pediatrics, elaborated on the information summarized in the November 13, 2014 last minute information for the court. She testified, although a chronic subdural hematoma could result from accidental trauma, in a child Isis's age, who cannot stand on her own, the caretaker would know of the accident, for example, if she had been dropped or bumped with sufficient force to cause the vessels to tear and bleed. The mechanisms usually responsible for causing inexplicable injury in a child are shaking, throwing or slamming the child against a surface. Bruising does not always result and, in Isis's case, would have healed by the time Isis was admitted into the hospital because of the age of the chronic subdural hematoma. Dr. Murray disagreed with the opinion the chronic subdural hematoma was caused by a traumatic birth, explaining, based on her review of

6

Isis's birth records, there was no indication she had a traumatic or unusual birth. Although her shoulders did get stuck, that was a common complication with large babies. The records reflected Isis was delivered within a minute of being stuck. Moreover, even if a chronic subdural hematoma had occurred as a result of the delivery, it would have resolved by the time Isis was seen at Miller's Children's Hospital.

Dr. Lubens, deemed an expert in child neurology, pediatrics and clinical neurophysiology, testified he strongly disagreed with Dr. Murray's opinion that Isis's injuries were the result of nonaccidental trauma. He provided several reasons: As indicated in his earlier letter, Isis had large subarachnoid spaces over her brain at birth, as evidenced by her large head circumference (in the 95th percentile at birth),[3] which predisposed her to intracranial hemorrhaging from relatively normal events and handling. (Dr. Lubens opined Isis's large head may have been responsible for her shoulders becoming stuck during delivery.) Although Dr. Lubens also believed Isis had a traumatic birth, he did not think the chronic subdural hematoma had been caused by the traumatic birth. Dr. Lubens opined the door hitting Isis in the head may have caused the acute subdural hematoma, but not the chronic one. He also did not believe Adrian kicking Isis in the head or Ramon possibly rolling over on her caused the chronic hematoma. Dr. Lubens had never seen a case of child abuse involving a chronic subdural hematoma with no other injuries such as retinal hemorrhaging or external signs of trauma. Isis had none of those types of injuries. Dr. Lubens was treating Isis, and she was doing well and did not have any residual damage from the seizure episode.

Nicole and Julian testified largely consistent with the Department's reports except Julian testified Nicole did not see Ramon choke him because she was in the hallway and he did not know whether she knew it had happened. The first person he ever told about the incident was Rocio V. after she asked him if Ramon had ever hurt him. Rocio V.

---

[3]    Dr. Lubens acknowledged there were no brain scans confirming his theory Isis had large subdural spaces at birth.

confirmed Julian's testimony except she believed Nicole may have seen what had occurred based upon what Julian had said, but did not know to what extent.

c. *The juvenile court's decision*

On May 20, 2015 the court dismissed the b-4 count asserting Nicole had failed to adequately address Adrian's behavioral and emotional problems[4] and sustained the remaining allegations. The court explained it credited Dr. Murray's testimony in resolving the conflict between her and Dr. Luben's opinions as to the cause of the chronic subdural hematoma, pointing out Dr. Murray had been part of Isis's treatment team and had consulted with the other doctors who had treated her at the time of injury.[5] Accordingly, the court found, although it was undisputed Isis had a large head, there were no brain scans supporting Luben's theory she also had large subdural spaces from birth that predisposed her to chronic subdural hematomas; absent any credible explanation from the parents as to how the injury had occurred, it must have been caused by nonaccidental trauma sufficient to cause her brain to bounce around inside her skull and tear blood vessels.

The court further found, based on the totality of the evidence, the parents knew or should have known of Isis's injuries. Although the court did not identify which parent had inflicted the trauma, it implied it was Ramon, observing, "[T]he period when [Ramon] began to have contact with [Isis] and care for her overlaps with the estimated age of the chronic subdural hematoma." The court also found credible Julian's testimony that Ramon had choked him, noted other evidence in the record demonstrating Ramon's "violent propensities" and identified Ramon's admitted history of drug and alcohol use and lack of evidence corroborating his contention he had stopped as support for the allegation his substance abuse endangered Isis.

---

4       Counsel for the children had asked the court to dismiss this count.

5       The court stated both doctors had agreed the recent acute subdural hematoma could have been caused by the door hitting Isis in the head, an accidental occurrence.

With respect to the allegation Nicole and Ramon had failed to seek timely medical care for Isis, the court found persuasive the evidence that Isis had been exhibiting symptoms—not eating well, lethargy, drowsy eyes even when awake—three to four days before the seizure and neither parent sought medical treatment until she began having seizures notwithstanding Ramon had told Nicole Isis's symptoms were scaring him. Additionally, Isis had never been treated for the initial subdural hematoma.

Regarding dismissal of the b-4 count, the court explained Adrian ultimately had been brought current on his immunizations and Nicole "did provide testimony about having moved from a different state back to California and how that impacted her ability to obtain care right away. She had reapplied for Medi-Cal after she moved back to California. And according to her testimony, as well as the information in the report, the referral for Adrian was pending."

On June 16, 2015 the court declared the children dependents of the juvenile court, removed them from parental custody, granted Nicole monitored visitation, ordered the Department to provide family reunification services for Nicole, contrary to the Department's recommendation, and ordered Nicole to participate in parenting classes and individual therapy to address case issues. Family reunification services were not ordered for Ramon.

## DISCUSSION

1. *Standard of Review*

Generally, we review the juvenile court's jurisdiction findings and disposition order for substantial evidence. (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 966; *In re R.C.* (2012) 210 Cal.App.4th 930, 940.) Under this standard "[w]e review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible." (*In re David M.* (2005) 134 Cal.App.4th 822, 828; accord, *In re Drake M.* (2012) 211 Cal.App.4th 754, 763.)

9

When the Department has failed to carry its burden of proof, however, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'"  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

2. *The Sufficiency-of-the-Evidence Challenge to the Section 300, Subdivision (e), Finding Is Moot*

Section 300, subdivision (e), provides for dependency court jurisdiction when "[t]he child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child."  This "abuse finding may be based upon circumstantial showing that the parents knew or reasonably should have known about the abuse, even when it cannot be determined which caretaker inflicted the abuse."  (*K.F. v. Superior Court* (2014) 224 Cal.App.4th 1369, 1382.)  The jurisdiction finding may be made by a preponderance of the evidence.  (*Ibid.*; § 355, subd. (a).)

Section 361.5, subdivision (b)(5), permits the court to deny reunification services to a parent when the court finds by clear and convincing evidence "[t]hat the child was brought within the jurisdiction of the court" based on a section 300, subdivision (e), abuse finding.  (*In re Kenneth M.* (2004) 123 Cal.App.4th 16, 21 ["[r]ead together, those provisions permit denial of reunification services to either parent on a showing that a parent or someone known by a parent physically abused a minor"].)  However, a denial of reunification services pursuant to section 361.5, subdivision (b)(5), need not apply to both parents:  "It may well be that the minor's *other* parent was in no way involved, either as the abuser or as one with the requisite knowledge of abuse by another.  There is no reason in this type of situation to deny the other, or innocent, parent reunification services."  (*In re Joshua H.* (1993) 13 Cal.App.4th 1718, 1732.)

Nicole challenges only the section 300, subdivision (e), finding, contending the Department failed to prove by a preponderance of the evidence she knew or reasonably

10

should have known Ramon had subjected Isis to nonaccidental trauma causing the chronic subdural hematoma.[6] She argues she left Isis alone in Ramon's care, there was no evidence Isis had any external signs of injury, she did not learn until after Isis's seizure that Ramon had choked Julian, and there was simply no reason for her to believe Ramon had abused Isis before the hematomas were discovered.

We agree the facts in this case are distinguishable from those discussed by Nicole in which courts have concluded a custodial parent knew or reasonably should have known a child was being abused. (See, e.g., *In re Joshua H.*, *supra*, 13 Cal.App.4th at pp. 1723-1724 [mother knew boyfriend had hit and pushed baby and lied about bruises, but contended she did not recognize severity of child's injuries]; *In re E.H.* (2003) 108 Cal.App.4th 659, 665, 669-670 [Newborn infant with multiple fractures from one to six weeks old lived in a home with several family members and "slept on the floor near a bed occupied by a blind, developmentally disabled adult who habitually rolled out of bed and dragged herself around the apartment. The child cried whenever she was handled; having received a diagnosis of likely colic, the parents did nothing to follow up. The only reasonable conclusion to be drawn from the facts of the instant case was that someone in the home was causing E.s' injuries, and that [the parents] *reasonably* should have known (since they lived there) the identity of the perpetrator."].) Nevertheless, we need not determine whether the evidence of the more subtle circumstances in this case suggesting Isis may have been injured rather than simply teething support the juvenile court's finding Nicole knew or reasonably should have known Ramon was physically abusing the infant. The finding under section 300, subdivision (b) (count b-3), that Nicole failed to provide adequate medical treatment for Isis has not been challenged on appeal. That finding of medical neglect provides an independent ground for affirming the court's exercise of jurisdiction over Isis and her siblings. Accordingly, any insufficiency of the evidence to support the subdivision (e) finding is moot. (See *In re Ashley B.* (2011) 202

---

6      The same challenge could have been made to the court's findings under section 300, subdivisions (a) and (b), to the extent they were based on Nicole's failure to protect Isis from Ramon's physical abuse.

11

Cal.App.4th 968, 979 ["[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate"]; *D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1127 ["the juvenile court's jurisdiction may rest on a single ground"].)

   3. *The Juvenile Court Was Not Required To Sustain the Count Alleging Nicole Had Failed To Obtain Adequate Medical Care for Adrian*

The Department contends the juvenile court erred in dismissing count b-4 alleging Nicole had failed to obtain adequate medical care for Adrian, arguing there was ample evidence in the record to support the allegation: It was undisputed Adrian had not been immunized since he was nine months old and he had several behavioral problems— hitting his head, jealousy and mistreatment of Isis and aggression— for which Nicole had failed to seek adequate treatment. It further argues the likelihood Nicole would have sought treatment without juvenile court intervention was extremely low given her family members' characterization that she lacked initiative and expected other people to fix her problems.

The question, however, is not whether substantial evidence would support the allegation if the juvenile court had sustained it, but whether the evidence compels a finding in favor of the Department as a matter of law. (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) Given the evidence Nicole had reapplied for Medi-Cal after she moved back to California, a necessary prerequisite for someone in her economic circumstance to obtain medical care, and a referral for Adrian was pending—evidence the Department fails to mention—the juvenile court did not err in concluding the Department had failed to carry its burden of proof.

12

## DISPOSITION

The juvenile court's June 16, 2015 order is affirmed.

PERLUSS, P. J.

We concur:

ZELON, J.

BLUMENFELD, J.*

---

*    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.