Filed 1/18/23 Certified for Publication 1/27/23 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re T.R. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E079291 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J291308, J291312) |
| v. | OPINION |
| R.R., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Steven A. Mapes, Judge. Affirmed in part; reversed in part with directions.

Sean Angele Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel and Dawn M. Martin, Deputy County Counsel, for Plaintiff and Respondent.

1

Radell R. appeals from a dispositional order denying him reunification services with his eight-year-old and six-year-old daughters under the bypass provision in Welfare and Institutions Code section 361.5, subdivision (b)(6) for infliction of severe physical harm.[1] He argues the juvenile court failed to satisfy the statutory requirements for making a bypass finding under section 361.5, subdivision (b)(6) and the finding isn't supported by substantial evidence. We agree and therefore reverse the bypass finding and remand for the court to reconsider his entitlement to reunification services.

## I

## FACTS

A.    *Detention*

The subjects of this appeal are Radell's two daughters with A.S. (mother)—Taylor S. and Teegan S. On November 16, 2021, San Bernardino County Children and Family Services (the department) filed dependency petitions on behalf of Taylor and Teegan, and their older half sisters, Denise and Madison, alleging the girls came within section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), (d) (sexual abuse), and (j) (abuse of a sibling).[2] Taylor was 7 years old, Teegan was 5, Denise was 13, and Madison was 10. The department alleged that mother and Radell engaged in domestic violence and used excessive corporal punishment on the girls, that they failed to protect Taylor from the paternal grandmother, and that mother sexually abused Taylor by

[1] Unlabeled statutory citations refer to the Welfare and Institutions Code.

[2] Mother is not a party to the appeal nor are Denise and Madison or their biological fathers.

pouring alcohol on her vagina. The petitions also alleged the girls had previously been declared dependents "due in part to physical abuse by [Radell]."

The family had come to the department's attention several days earlier on November 11, 2021, when it received a referral alleging mother was physically abusing the girls, their biological fathers were neglecting them, and Denise had run away from home and was staying with the maternal grandmother. The social worker visited the maternal grandmother's home to interview Denise, who reported that mother and Radell were physically violent with each other and with her and her sisters.

According to Denise, two days earlier mother had hit her and Madison with a television cord on their face, neck, and arms, leaving welts that had since healed. She also described an incident that had happened three months earlier when Radell had gotten angry with her and Madison. She said he pushed her up against the wall and choked her, punched a hole in the wall, then pulled Madison off her bed by the hair. She said she'd run away from home because mother and Radell fought a lot and she didn't feel safe there.

The following day, the social worker interviewed Madison, Taylor, and Teegan at school. Madison told the social worker she didn't know what was going on with her older sister. She said mother had hit her with a belt, not a cord, and she had no idea how Denise was hit. She denied that Radell had ever pulled her off her bed by her hair. She said discipline was usually in the form of hitting the lower parts of the body with a belt.

3

Teegan said she had seen mother hit Denise and Madison with a television cord on the back of the neck. She said mother and Radell engaged in domestic violence and would discipline her and her sisters with a belt. She also reported some issues with mother and alcohol. She said mother had tried to make her drink alcohol once but Radell stopped her, and another time mother had poured alcohol on her vagina, causing a burning sensation. Taylor was reluctant to speak to the social worker. She said Radell told her to immediately let him or mother know if anyone tried to speak with her at school.

Later that day, the department took the girls into protective custody. Taylor was more forthcoming in her second interview. She said for discipline mother and Radell would generally yell and make them go to their rooms, but she also said she'd been "whoop[ed] with a shoe and hanger" (though the report doesn't say by whom). She said mother had hit her with a cord a few days earlier for not listening to her. When asked if she'd witnessed any choking, she said the paternal grandmother had choked her on the couch once. She said her parents didn't do anything when she told them about the incident.

In the detention report the department submitted along with the dependency petitions, the social worker noted the family had been involved in two previous dependencies. She said that in 2013 the juvenile court had exercised jurisdiction over Denise and Madison and ordered mother to stay away from Radell because he had placed two-year-old Madison in a tub of hot water, causing her to suffer first degree burns. In

4

2016, in a second dependency proceeding, the court removed all four girls from mother and removed Taylor and Teegan from Radell. Mother ultimately reunified with the girls, but the court bypassed services for Radell under section 361.5, subdivision (b)(6).

On November 17, 2021, San Bernardino County Superior Court Judge Steven Mapes found the department had established a prima facie case to exercise dependency jurisdiction over the girls and ordered them detained. Radell attended the hearing and asked for visitation and predisposition services. The judge ordered supervised visitation for mother and Radell once a week for two hours. The department placed Taylor and Teegan in the same foster home and placed Denise and Madison together in a different one.

B.      *Jurisdiction and Disposition*

The social worker interviewed the family a few weeks after the detention hearing. Although all of the girls reported that Radell lived with them, mother said he just visited, and Radell said he stayed there often though lived primarily with his mother. Both mother and Radell denied physically harming the girls or engaging in domestic violence with each other. Mother denied the cord incident and claimed the only object she ever hit her daughters with was a belt "because they said it was fine to whoop children with a belt in my parenting class." Radell said he didn't think it was possible his mother choked Taylor because one of her hands was broken.

5

Denise told the social worker she didn't want to return home because Radell was always there and mother would start fights with him. She said she'd seen mother push him down the stairs and bust his lip. She said mother had "anger issues" and "gets mad at us and tells us she does not like us." When asked if Radell ever hit her, she said no, he'd only choked her that time a few months earlier and pulled Madison off the bed by her hair. Mother, on the other hand, would hit her with hangers, belts, and an electronics cord, sometimes leaving welts.

Madison denied any forms of physical abuse by mother or Radell. However, when asked if she'd ever had bruises or marks on her body, she admitted that mother had recently hit her on the back of the neck with a cord, leaving a bruise.

Taylor said mother "whooped me with a cord because I knocked down a picture on the stairs." Teegan said that when she gets in trouble "Mommy and Daddy hit me with a belt." The social worker asked Teegan how she felt about her family and she replied, "They are my life."

In the months leading up to the jurisdiction and disposition hearing, Radell consistently visited with the children and participated in various predisposition services. The department had referred him to counseling to address violent tendencies related to physical abuse and domestic violence. His therapist reported his attendance was "excellent" and that he "readily engaged" in therapy. She said that though he had initially minimized or denied his issues with domestic violence and excessive corporal punishment, he came to realize his violent tendencies, "acknowledged that he made

6

mistakes, and developed a safety plan to avoid repeating those mistakes." She said Radell was not defensive about these issues but rather "showed remorse," "took full responsibility" for his actions, and "vowed to not use corporal punishment when disciplining his children in the future."

By May 2022, Radell had completed the parenting and domestic violence programs the department had referred him to. Records from the parenting program showed he'd completed the program with the highest scores in each parenting topic (e.g., empathy, discipline, and family roles). The department had also referred him to random drug testing due to a concern he was abusing marijuana. He showed up for each test and produced negative results.

Mother also consistently visited the children and completed the predisposition services the department had referred her to.

In its jurisdiction and disposition report, the department recommended providing reunification services for mother but noted its expectations were "guarded." The department's skepticism came from the fact mother had ignored the court's 2013 order to stay away from Radell and was continuing to deny he'd intentionally abused Madison. As for Radell, the department recommended bypassing reunification services under section 361.5, subdivision (b)(6), but it didn't include any reasons to support its recommendation. Presumably in support of its recommendation, it attached the following court records to its report: (1) petitions filed in 2013 for Denise and Madison, in which the department alleged Radell had caused Madison to suffer first degree burns by placing her in a tub of

7

hot water; (2) minute orders from that dependency showing the juvenile court sustained jurisdiction allegations against mother and ordered her to stay away from Radell; (3) petitions filed in 2016 for Taylor and in 2017 for Teegan, in which the department alleged that mother and Radell engaged in domestic violence and criminal activity in the children's presence and that Radell left drug paraphernalia in the home within the children's reach; and (4) minute orders from that dependency showing the juvenile court sustained jurisdiction allegations against mother and Radell, removed the children from mother and Radell, ordered reunification services for mother and bypassed them for Radell under section 361.5, subdivision (b)(6). We note, however, that the basis for the bypass finding is unclear from these records because the attached petitions associated with that dependency don't involve any infliction of physical harm allegations against Radell.

The contested jurisdiction and disposition hearing took place on June 6, 2022. The judge accepted the department's reports and Radell's documentation showing his participation in services, and the parties presented argument. Radell objected to the department's recommendation and argued he should receive reunification services. His counsel described the services he had already completed and argued his proactivity "really does show his willingness to engage and his willingness to change." Counsel argued Taylor and Teegan would benefit from services in this case because Radell was "very committed to making changes in his life."

The girls' counsel didn't address the issue of Radell's reunification services. She requested the girls receive counseling with mother to work on repairing their relationship with her. She also asked the department to assess whether a different social worker should be assigned to the case because the girls had raised concerns about the social worker and didn't feel comfortable talking to her.

The department argued the court should bypass services for Radell because he hadn't proven he would not abuse Taylor and Teegan's half-siblings. As for mother, it argued services would be appropriate because "she did succeed with reunification services [] during the last case."

The judge declared Taylor and Teegan dependents under section 300, subdivisions (a), (b), and (j). He ordered services for mother but denied them for Radell, stating Radell had "failed to meet his burden once the bypass has been established." The judge did not specify which bypass provision he was applying, but he later adopted all of the proposed findings and orders from the department's report and those identified section 361.5, subdivision (b)(6) as the applicable bypass provision.[3] The judge told Radell "to work on things and do a 388 when appropriate."

---

[3] The relevant proposed finding stated: "[T]here is clear and convincing evidence that . . . Taylor and Teegan have been adjudicated a dependent pursuant to any subdivision of § 300 as a result of severe abuse to Taylor and Teegan, a sibling or a half-sibling by [Radell], and it would not benefit Taylor and Teegan to pursue reunification services with [Radell]."

9

## II

## ANALYSIS

A.  *Reunification Services*

Radell argues the record contains insufficient evidence to support a bypass finding under section 361.5, subdivision (b)(6). We agree.

"'It is difficult, if not impossible, to exaggerate the importance of reunification in the dependency system.'" (*In re Albert T.* (2006) 144 Cal.App.4th 207, 217 (*Albert T.*), quoting *In re Luke L.* (1996) 44 Cal.App.4th 670, 678.) Because family preservation is so important in the early stages of a dependency, the Legislature has applied to reunification services a statutory presumption and heightened standard of proof. (*Albert T.*, at p. 217.) Thus, when a child is removed from the custody of their parent, the juvenile court *must* provide the parent with reunification services *unless* it finds by clear and convincing evidence the case falls within one of the 17 enumerated exceptions in section 361.5, subdivision (b), commonly called "bypass provisions." (§ 361.5, subd. (a).) If the court finds by clear and convincing evidence that a bypass provision applies, it must deny services unless the parent proves that services would be in the child's best interests. (§ 361.5, subd. (c).) While the parent bears the burden of proof on that issue, the department bears the burden of proving the threshold issue of whether a bypass provision applies. (*In re A.E.* (2019) 38 Cal.App.5th 1124, 1141.)

The bypass provision at issue here—section 361.5, subdivision (b)(6)—applies when a "child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of . . . the *infliction of severe physical harm* to the child, a sibling, or a half sibling . . . by a parent, . . . and the court makes a factual finding that *it would not benefit the child* to pursue reunification services with the offending parent." (§ 361.5, subd. (b)(6), italics added.)[4] "A finding of the infliction of severe physical harm, for the purposes of this subdivision, may be based on, but is not limited to, . . . deliberate and serious injury inflicted to or on a child's body . . .; deliberate and torturous confinement of [a] child . . . in a closed space; or any other torturous act . . . that would be reasonably understood to cause serious emotional damage." (§ 361.5, subd. (b)(6)(C).)

When determining whether the child would benefit from reunification services, the statute requires the court to consider the following factors, as well as any other circumstances it deems relevant: (1) the "specific act or omission" that caused the severe physical harm; (2) the "circumstances under which" the harm was inflicted; (3) the "severity of the emotional trauma" the harm caused; (4) any "history of abuse of other children by the offending parent"; (5) the likelihood the child may be safely returned to the care of the offending parent within 12 months with no continuing supervision; and (6) whether "the child desires to be reunified with the offending parent." (§ 361.5, subd. (i).)

---

[4] Though not relevant in this case, section 361.5, subdivision (b)(6) also applies to the infliction of "severe sexual abuse."

11

Additionally, section 361.5, subdivision (k) requires the court to "read into the record the basis for a finding of . . . the infliction of severe physical harm" and "specify the factual findings used to determine that the provision of reunification services . . . would not benefit the child." In these ways, section 361.5, subdivision (b)(6) is different than the other bypass provisions. It requires an *additional finding* (that the child "would not benefit") and the court must state for the record *the bases for both findings*.

Here, it's undisputed the judge failed to satisfy these additional requirements. In denying reunification services for Radell, the judge simply said he was adopting the proposed findings in the department's report. He did not state for the record which bypass provision applied, mention the infliction of severe physical harm or identify any specific instances of it, or address whether Taylor or Teegan would benefit from attempting to reunify with their father. Though the department's proposed finding identified the applicable bypass provision, it similarly did not identify a specific instance of severe physical harm or state why the girls would not benefit from reunification services.

Radell argues the insufficiencies of the ruling, on their own, warrant reversal. The department argues we should infer the required findings and stated reasoning from the record and affirm. We see two problems with the department's approach.

First, "[g]iven the importance of reunification services in the dependency system, we have considerable doubt as to the propriety of implying findings from an otherwise silent record to justify denial of those services, particularly when the Legislature has . . . mandated findings by clear and convincing evidence before applying any section 361.5,

subdivision (b)." (*Albert T.*, *supra*, 144 Cal.App.4th at p. 219.) This reasoning applies with even greater force to section 361.5, subdivision (b)(6) which, unlike the other bypass provisions, requires the court to state its reasons for applying the provision into the record. (§ 361.5, subd. (k).)

Second, even if we were willing to infer the required findings and reasoning from the record, there isn't enough evidence in the record to make the necessary inferences. We review a juvenile court's factual findings for substantial evidence. (*In re Caden C.* (2021) 11 Cal.5th 614, 640.) When the clear and convincing evidence standard of proof applied in the juvenile court to the challenged finding, we must "account for" that heightened standard by determining whether "the record as a whole contains substantial evidence from which a reasonable fact finder could have found it *highly probable* the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) On this record, there is not substantial evidence to support either required finding.

Starting with severe physical harm, the record contains no evidence that Radell's corporal punishment resulted in serious harm or injury to any of the girls. (§ 361.5, subd. (b)(6)(C).) Denise said Radell had choked her once and pulled Madison off the bed by her hair (though Madison denied that happened), and all four girls said that both mother and Radell would spank them with belts for punishment. While we certainly don't condone this kind of physical abuse, there is no evidence it resulted in any injuries to the girls, let alone serious injuries. For example, there is no evidence about how hard Radell touched the girls during any of the reported incidents, whether he caused any marks or

13

bruises, or whether the girls felt pain. Without that kind of information, there is no basis from which to conclude Radell inflicted severe physical harm on his daughters or their half sisters. (See, e.g., *In re Joshua H.* (1993) 13 Cal.App.4th 1718 [evidence showed the infant had suffered eight fractured ribs, a black eye, and bruising on the forehead]; *In re S.G.* (2003) 112 Cal.App.4th 1254, 1256 [physician opined the parent's aggressive beatings to the child's head "had the potential to leave her with brain damage"]; *Jose O. v. Superior Court* (2008) 169 Cal.App.4th 703, 705 [sufficient evidence of "serious emotional damage" within the meaning of the bypass provision where three-year-old child witnessed his father stab his mother to death and when police arrived the child was sitting next to his mother's body and told them he was "scared" and "Daddy killed Mommy"].)

The department argues we can infer support for the necessary finding from the evidence Radell had inflicted first degree burns on Madison in 2013, when she was two years old. The problem with this argument is that section 361.5, subdivision (b)(6) applies to cases of *current* physical abuse. Though some bypass provisions can be triggered by events from previous dependencies, section 361.5, subdivision (b)(6) applies to the infliction of severe physical harm that led to the current dependency. For example, section 361.5, subdivision (b)(3) applies in cases where "the child or a sibling of the child has been *previously* adjudicated a dependent," and section 361.5, subdivision (b)(10) applies in cases where the parent failed to reunify with the child's sibling or half sibling after they "*had been* removed" from the parent's custody, and section 361.5, subdivision

14

(b)(6) applies in cases where the child or their sibling "*has* been" declared a dependent as a result of the infliction of severe physical harm. (Italics added.)

Madison's injury, though indeed serious, occurred several years ago, before Taylor and Teegan were born, and was not a basis for declaring any of the girls dependents in this case. (See., e.g., *In re I.A.* (2011) 201 Cal.App.4th 1484, 1495 ["a finding of jurisdiction must be based on current conditions . . . [a] past jurisdictional finding, particularly one based largely on a single instance of violence already five years old, would be entitled to no weight in establishing jurisdiction, even assuming it was admissible for that purpose"].) While a parent's history of abuse is one of the factors a court must consider when determining whether the child *would benefit* from services, it cannot support the requisite finding of severe physical harm.

In concluding the record lacks sufficient evidence to infer a finding of severe physical harm for purposes of section 361.5, subdivision (b)(6), we are not implying Radell's actions weren't serious. To be sure, the evidence he uses excessive corporal punishment supports both jurisdiction and removal because it demonstrates the girls are in danger of suffering serious, nonaccidental physical harm within the meaning of section 300, subdivision (a) and it is not currently safe for them to return home. But it's crucial to distinguish the grounds for jurisdiction and removal, which are based on a *risk* of injury, from the grounds for bypass under section 361.5, subdivision (b)(6), which must be based on an *actual* injury. In this case, the only evidence of an injury inflicted by Radell comes

15

from a dependency initiated nearly a decade earlier and to which neither he nor the girls were parties.

Turning to the second finding necessary for applying section 361.5, subdivision (b)(6), the record also lacks sufficient evidence from which to infer a finding that Taylor and Teegan wouldn't benefit from attempting to reunify with their father. As for whether services are likely to resolve Radell's parenting issues, though he doesn't have a history of successfully completing services like mother, his engagement with predisposition services in this case is encouraging. As his counsel pointed out at the hearing, he has shown initiative, remorse, and a willingness to change. And, because mother is already receiving reunification services, we need not be concerned that providing him services could delay the girls' path to permanency. (See *Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1121 [unless the other parent is getting services, the case is "fast track[ed]" to permanency planning so that a permanent out-of-home placement can be developed without undue delay].)

As for the girls, though the department didn't ask Taylor and Teegan whether they wanted to try to reunify with their father, the record contains no evidence suggesting they wouldn't. For example, there's no evidence they were suffering from any emotional or development issues or harbored negative emotions toward Radell. To the contrary, Teegan told the social worker that her family is "her life." And, at five and seven years old, it's possible they have spent a significant amount of time in Radell's care and are bonded to him.

16

The department argues this evidence isn't sufficient to satisfy *Radell's* burden of proving reunification is in the girls' best interests. But the department is confusing the no benefit finding in section 361.5, subdivision (b)(6) with the best interests finding in subdivision (c). In this case, the burden remained with the department to prove the girls *would not benefit* from services, as that finding is necessary for applying section 361.5, subdivision (b)(6) in the first place. Thus, because the department had to prove no benefit by clear and convincing evidence and because the record contains some evidence indicating they *would* benefit, we cannot infer the necessary finding.

Every parent who receives reunification services poses a risk to their child's safety in some way. The reason reunification services "play a critical role in dependency proceedings" is because they offer the parent an opportunity to work on minimizing those risks while the child is cared for in a safe setting. (*Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 845.) Because we conclude the department failed to prove Radell isn't entitled to that opportunity, we reverse the order denying him reunification services and remand for a new hearing on the issue.

B.      *Indian Child Welfare Act*

Radell raises an additional argument on appeal. He claims conditional reversal is required because the department failed to comply with its duty of further inquiry under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) and related state statutory provisions. We conclude his challenge isn't ripe.

Under California law, the juvenile court and child welfare agency have "an affirmative and continuing duty to inquire" whether a child subject to a section 300 petition may be an Indian child. (§ 224.2, subd. (a).) The duty consists of three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice. (*In re D.F.* (2020) 55 Cal.App.5th 558, 566.) When the initial inquiry gives the juvenile court or social worker "reason to believe that an Indian child is involved" (§ 224.2, subd. (e)), the court and social worker must conduct further inquiry to "determine whether there is reason to know a child is an Indian child." (§ 224.2, subd. (e)(2).) The department "does not discharge their duty of further inquiry until they make a 'meaningful effort' to locate and interview extended family members and to contact [the Bureau of Indian Affairs] and the tribes." (*In re K.T.* (2022) 76 Cal.App.5th 732, 744.)

Here, Radell and mother denied Indian heritage, as did all of the extended family members the judge interviewed at the detention hearing (i.e., the maternal cousin, maternal aunt, maternal grandmother, paternal grandmother, and paternal uncle), except for the maternal grandmother, who said that mother's father was Indian. When the social worker conducted a follow-up ICWA interview, the maternal grandmother said the maternal grandfather (who passed away many years earlier when mother was a young child) "used to receive checks and he stated it was due to being Indian." She was unable to give the social worker any more information on the matter, however. She could not identify a specific tribe or provide enrollment or registration numbers reflecting tribal

18

membership. She denied that anyone in the family was born on or lived on an Indian reservation, attended Indian schools, or utilized any Indian services or resources.

Citing *In re I.F.* (2022) 77 Cal.App.5th 152, Radell argues the social worker should have also asked the maternal grandmother where the maternal grandfather's "ancestors . . . were from" as the answer could narrow the department's search for a tribe to a specific geographic region where there is a finite number of federally recognized Indian tribes. (See *id.* at pp. 164, 166 [where mother said she'd been told she had Indian heritage through her great-grandfather and another family member said they had been told "the family had Native American ancestry in Minnesota," the department was required to "diligently gather the biographical information related to the maternal great-grandfather and provide that information to the Bureau of Indian Affairs and the federally recognized tribes in Minnesota"].) Radell also argues the department should have interviewed a paternal aunt who had been mentioned in one of the prior dependencies.

Because this case is ongoing and the department and court are under a continuing duty to inquire whether Taylor and Teegan may be Indian children, Radell's claim of inadequate inquiry isn't ripe. (*In re S.H.* (2022) 82 Cal.App.5th 166, 179 ["So long as proceedings are ongoing and all parties recognize the *continuing* duty of ICWA inquiry, both the Agency and the juvenile court have an adequate opportunity to fulfill those statutory duties"]; accord, *In re Dominick D.* (2022) 82 Cal.App.5th 560, 563, 567.) As the case continues, the department will have the opportunity to ask the maternal grandmother additional questions about the maternal grandfather and interview the

19

paternal cousin if she is "readily available." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 744.)

## III

## DISPOSITION

We reverse and vacate the dispositional order denying Radell reunification services under section 361.5, subdivision (b)(6), and we remand the matter for a new hearing on whether to order reunification services for him. We affirm the dispositional orders in all other respects.

SLOUGH
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.

CERTIFIED FOR PUBLICATION

COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

| | |
|---|---|
| In re T.R. et al., Persons Coming Under the Juvenile Court Law. | E079291 |
| | (Super.Ct.No. J291308 & J291312) |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br> Plaintiff and Respondent,<br> v.<br>R.R.,<br> Defendant and Appellant. | The County of San Bernardino<br><br>ORDER GRANTING PUBLICATION |

THE COURT

      The request for publication of the opinion filed on January 18, 2023 is GRANTED. The opinion meets the standard for publication as specified in California Rules of Court, rule 81105(c). It is ORDERED that the opinion filed on this matter on January 18, 2023, be certified for publication.

<u>SLOUGH          </u>
                                                   J.

We concur:


<u>McKINSTER       </u>
              Acting P. J.


<u>CODRINGTON     </u>
              J.