Filed 11/26/25  J.M. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| J.M. et al.,<br><br>    Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>    Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU,<br><br>    Real Party in Interest. | A174020<br><br>(Contra Costa County<br>Super. Ct. No. J2500237) |

Julia M. (mother) and G.S. (father) are the parents of now 10-month-old J.S.  They each petition for extraordinary relief to overturn a disposition order declining to order reunification services and setting a Welfare and Institutions Code[1] section 366.26 hearing to establish a permanent plan for the child.

Because the court took jurisdiction based on severe physical abuse of the baby, governing law allowed the court to order reunification services only

---

[1]  Further statutory references will be to the Welfare and Institutions Code.

1

if it found such services would be in the child's best interests and likely to prevent further abuse. The Contra Costa County Children and Family Services Bureau (Bureau) recommended making these findings and providing services, but the court disagreed. We are unable to conclude the court's decision was unsupported and therefore deny the petitions.

## BACKGROUND

### I.

### *Underlying Facts*

In the late afternoon on March 29, 2025,[2] the parents found J.S. inside their locked bedroom, face down on the floor, with the two-year-old son of mother's cousin standing over him. J.S. was admitted to the intensive care unit at UCSF Benioff Children's Hospital in Oakland with extensive head trauma. His injuries included subdural hematomas, scalp contusions, subconjunctival hemorrhages and lip injuries, and in addition to "acute intracranial hemorrhage," it was "highly suspected" that he had "old blood product to the right parietal brain (subarachnoid space)" that "raises concern for an additional past episode of head trauma."

The parents maintained that J.S.'s injuries were caused by the two year old or possibly J.S.'s car seat. According to mother, she went to the bathroom after putting J.S. to sleep and when she came out, she found the bedroom door locked, "broke the door open" and saw J.S. face down on the floor with the two year old, G., standing over him. Father said he was in the living room with family friends, with the TV on loud, when J.S.'s eight-year-old half-sister, J.M., said she heard the baby crying and the bedroom door was locked, and asked where G. was. Father opened the bedroom door with a

---

[2] Further references to dates will be to 2025 unless otherwise indicated.

2

credit card and saw J.S. face down on the floor with G. standing over him and "slowly backing up."

G.'s mother reported that G. had locked himself in the same room three hours before the incident, and that after the incident she noticed bite marks on J.S.'s cheek and a lump on his head. When asked, " '[W]hat did you do?' " G. slapped his father.

Mother told the social workers she believed she was suffering from postpartum depression. Police officers serving a search warrant at the family's home around 1:44 a.m. on March 30 saw a man they assumed was father who said he "wasn't OK and wanted to cut his wrists." Mother "tried to run away" and was detained by detectives but not arrested.

The pediatrician at the UCSF Benioff Children's Hospital Oakland said it was not plausible a two year old could have caused injuries as extensive as J.S.'s, and that the injuries were consistent with violent physical assault and not accidental in nature. At a follow-up appointment after his discharge from the hospital, he was found to have several rib fractures that "appeared to be from squeezes, most likely inflicted by an adult or a teenager." A medical note reiterated that "a toddler in and of himself could not cause the totality of the traumatic injuries this infant sustained. This infant's injuries are consistent with a violent physical assault and a past episode of occult head trauma."

J.S. was discharged from the hospital on April 11 with a nasogastric tube he would need "long term" as a result of "injuries to his brain" that "impacted his ability to swallow and suck, making it harder for him to feed." Subsequent reports described him as having extensive medical needs and attending frequent medical appointments, speech therapy and occupational therapy. He was behind on developmental milestones; he had poor oral

intake that might be a result of his brain injury; and he was diagnosed with Unspecified Trauma and Stressor Related Disorder, with symptoms that "impact his attachment, family, sleep and regulatory functioning and put his development at risk."

## II.

### *Detention and Jurisdiction*

On April 2, 2025, the Bureau filed a juvenile dependency petition alleging that then three-month-old J.S. came within the provisions of section 300 based on serious physical harm suffered while in the care of his mother and father. Specifically, the petition alleged that J.S. was admitted to the hospital on March 29 with "extensive non-accidental injuries above the neck including but not limited to: subdural hematoma, nose abrasion, forehead contusion and abrasion, contusion of occipital region of scalp, contusion of cheek, facial contusion, contusion of proprietor region of scalp, subconjunctival hemorrhage, contagion [*sic*] of left temporal/frontal scalp, and contusion of intraoral surface of lip," as well as "an old blood product to the right parietal brain (subarachnoid space)" that "raise[d] concern for an additional past episode of head trauma."

Under section 300, subdivision (a), the petition alleged that the parents had not provided a reasonable explanation for the injuries; their report that the injuries were caused by a two year old was not plausible; and the injuries were of a nature that ordinarily would not be sustained except as a result of unreasonable or neglectful acts or omissions of either parent.[3] The same nonaccidental and unexplained injuries were the basis for allegations of

---

[3] Subdivision (a) of section 300 applies when a child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian."

4

severe physical abuse under section 300, subdivision (e).[4]  The petition additionally alleged under section 300, subdivision (b) that the parents had failed or were unable to supervise or protect the child adequately, and were unable to provide regular care due to the parents' mental illness in that the mother struggled with postpartum depression that affected her ability to provide proper care and supervision and the father reported on March 30 that he was " 'not okay and wanted to cut his wrists.' "[5]

The Bureau recommended that both J.S. and J.M. be removed from parental custody.  J.M. had been placed in a licensed resource family home, and the Bureau planned to reunite the children when J.S. was discharged from the hospital.  At the initial detention hearing on April 3, the court found father to be the presumed father, ordered J.S. and his eight-year-old sister J.M. detained, ordered mental health services and parenting education for the parents pending further proceedings, authorized supervised visitation and, at mother's request, set a contested detention hearing.  After the contested hearing on April 7, the court reaffirmed its orders.

---

[4]  Section 300, subdivision (e) brings a child within the dependency jurisdiction of the court if "[t]he child is under five years of age and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child."

[5]  Section 300, subdivision (b) gives rise to dependency jurisdiction over a child if he or she "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following:

"(A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child. . . . [¶] . . . [¶]

"(D) The inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

A contested jurisdiction hearing was initially set for May 12, then continued to July 14. In a report dated May 12, the Bureau recommended that the court sustain the petition. The Bureau expressed concern with "discrepancies" in reports about the incident. Specifically, the report stated it was "unclear" whether it was mother or father who opened the locked bedroom door and was the first to see the two year old backing away from J.S.; there was conflicting information about the two year old's involvement in the incident and history of aggression toward other children;[6] father gave conflicting information about substance use;[7] and, when asked what discipline mother used with J.M., mother said she would give a time out or take away J.M.'s phone while J.M. said she also got spankings.

As of a June 2 report, Mother had informed the social worker she was doing individual therapy once a week. She had completed six of six parenting classes. Two of three drug tests were negative and one was a "no-show." Due to a "misunderstanding," mother had not tested for two weeks because she believed testing was a "one-time service," but the social worker had restarted ongoing drug testing.

Father was scheduled to begin weekly individual therapy and had completed six of six hours of parenting classes. He had one negative drug test and one no-show the social worker attributed to the misunderstanding; he also had missed two weeks of testing and ongoing testing had been restarted.

---

[6] The two year old's mother, K., told a social worker that mother wanted her to testify that her son had caused J.S.'s injuries, but K. was not going to testify that he did something she didn't see him do.

[7] When interviewed on March 29, father said he smoked " 'weed' " occasionally, but on March 31 he denied any substance use.

The Bureau reported that visits had been "progressing positively," with both parents "responsive to [J.S.]'s cues and needs" and "consistently arriving on time." Each parent was spending individual time with the children in addition to shared family time.

The Bureau's updated July 14 report again expressed concern over inconsistencies in accounts about the March 29 incident and recommended finding allegations of the petition true. The Bureau noted two past reports made by the mother of father's two older children, I.S.[8] In 2020, I.S. reported that her child said mother had thrown him on a bed, knocking the wind out of him; I.S. also said that in 2019 mother had disciplined the child by spanking him. In 2017, I.S. reported an incident of domestic violence in which father "bent her over" a fence and threw her to the ground.

The Bureau's report stated that during visits both parents demonstrated "positive and developmentally appropriate parenting strategies." The social worker gave examples of the parents showing affection, responding to J.S.'s physical needs and providing "age-appropriate stimulation," and stated, "Overall, their interactions reflect nurturing, responsive, and collaborative parenting focused on [J.S.]'s well-being."

The parents' random drug tests in June and July were all negative. Father's therapist reported that father actively participated in sessions and was never late or absent. Mother's therapist had not responded to the social worker's attempts to communicate, but mother's counsel subsequently submitted letters dated May 7 and June 30 "indicating mother was diagnosed

_____

[8] Father and I.S. were legally married but had separated in 2017. At the time of these proceedings, I.S. had temporary full custody of their children and father had supervised visits.

7

with post-traumatic stress disorder and . . . was actively involved in weekly therapeutic services."

On July 14, both parents waived their rights and pleaded no contest to the allegations. The juvenile court sustained the petition and ordered supervised visitation.

## III.

### *Disposition*

In its disposition report, the Bureau recommended that the court order reunification services for both parents. The report related that mother acknowledged "ongoing emotional struggles, including feelings of sadness and a sense of failure toward her daughter." Mother saw her involvement with the Bureau as a "wake-up call, reinforcing the importance of staying on track and creating a better future." Father also saw the family's involvement with the Bureau as a "wake-up call that has helped him realign his priorities, deepen his appreciation for time with his children, and strengthen his commitment to ongoing self-improvement."

The Bureau noted that mother's "history of complex trauma, including physical, sexual, and emotional abuse, exposure to domestic violence, and chronic instability—may significantly impact her ability to parent effectively," but observed that she had "demonstrated resilience through employment, attempts to reduce substance use, and efforts to care for her children."[9] Similarly, the report described problematic aspects of father's history, including academic struggles, low self-esteem, and "early involvement with delinquent peers, substance use, and legal issues

---

[9] Mother told the social worker she had used substances in her youth, including Xanax, cocaine, marijuana and liquor, primarily to gain acceptance from peers.

8

reflect[ing] past risk-taking behaviors that could challenge consistent boundary-setting and modeling of healthy behaviors," but saw his "current engagement in weekly therapy and abstinence from substances over the past several months" as "positive indicators of his motivation to improve."[10] As to each of the parents, the report stated, "The Bureau believes that with consistent mental health support, parenting education, and a structured support system, [they] may be able to strengthen [their] parenting capacity over time. The Bureau will want to see [them] use [their] family support network, therapist and learned parenting techniques. The Bureau is confident that [they] will continue to be able to navigate through [their] case successfully."

A contested disposition hearing was held on August 11. County counsel acknowledged that because the court found jurisdiction based on allegations of severe physical abuse to a child under age five, it could order reunification services only if it found clear and convincing evidence that such services would be in J.S.'s best interest (§ 361.5, subd. (c)(2))[11] and found, based on competent evidence, that reunification services are "likely to prevent

---

[10] Father reported past use of cocaine and marijuana, with his last use of cocaine about 18 months before these proceedings and his last use of marijuana and alcohol about three months before.

[11] Section 361.5, subdivision (c)(2) provides that "[t]he court shall not order reunification for a parent or guardian described in [paragraph (6) of subdivision (b)] unless it "finds, by clear and convincing evidence, that reunification is in the best interest of the child." Subdivision (b)(6) applies when "the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of . . . the infliction of severe physical harm to the child, . . . by a parent or guardian, as defined in this subdivision, and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian." (§ 361.5, subd. (b)(6)(A).)

reabuse." (§ 361.5, subd. (c)(3).)[12] Nevertheless, the Bureau believed reunification would be in J.S.'s best interest based on "the performance of the parents thus far, their engagement in services, their developing awareness of their own emotional states, and . . . [the] effects of their own traumatic histories on their parenting skills or lack thereof." In light of the "commitment of the parents to learning how to care for the child adequately and the circumstances which prevent them from perhaps taking as much responsibility for this situation," the Bureau wanted to give them a chance to continue the services they had begun and "rebuild their relationship with" J.S. County counsel commented, however, that "it will be very difficult to return [J.S.] to their care without some acknowledgment of their own personal responsibility for the injuries that occurred in this case. There's no question that the evidence is overwhelming that [G.] did not inflict these injuries on [J.S.], and it's very concerning that neither of the parents has been able to admit to what actually occurred because we believe they both know that it wasn't [G.]."

---

[12] Section 361.5 subdivision (c)(3) provides, "[i]n addition, the court shall not order reunification in any situation described in paragraph (5) of subdivision (b) unless it finds that, based on competent evidence, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." Subdivision (b)(5) allows the court to deny reunification services where it has found "[t]hat the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent or guardian."

The Bureau in the present case did not rely on the second alternative finding under (c)(3)—that "failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent" —because it observed that J.S. "has been out of the home for so long and is quite attached to his caregiver, and we don't have evidence of that positive and close attachment with the parents."

10

J.S.'s counsel objected to the Bureau's recommendation and asked the court to order no services and set a section 366.26 hearing.  Counsel emphasized the "catastrophic" injuries suffered by the three-month-old infant while both parents were present and responsible for supervision, for which the parents offered only "implausible theories that the medical evidence flatly refutes."  Counsel argued there was no evidence reunification was in J.S.'s best interest, as he was "medically fragile, developmentally delayed, and recovering from a traumatic brain injury" and needed "stability and safety, not a return to the same environment where the abuse occurred."  As the parents did not acknowledge what happened and continued to blame the two year old, counsel maintained there were no services that would remedy the situation.

Mother asked the court to follow the Bureau's recommendation, emphasizing the Bureau's determination that reunification would be in J.S.'s best interest, the work mother had been doing to prove her commitment to reunification and improve her own circumstances and her parenting.  Counsel stated that mother believed the Bureau's involvement with the family would be beneficial with respect to parenting both J.S. and J.M.; she "[was] not denying" that leaving J.S. unattended "at best, was severe neglect," and she was willing to do anything the court ordered to show her commitment and improve her parenting.  Taking issue with J.S.'s attorney's statement that the child did not know his mother, counsel noted that J.S. "has cried at the termination of visitation" and pointed to the Bureau's positive reports about mother's interaction with J.S. during visits.  Counsel also argued that bypassing services would also implicate J.M.'s opportunity to have a relationship with him.

Father's counsel represented that father understood "there was severe neglect" and took personal responsibility for "having this happen to his child." Counsel believed father was "very confused" and "probably just took some things for granted" because he was working so much; he was "still grappling" with what happened, was very sorry for it and wanted to do everything he could to be a better parent and prevent severe abuse from happening again. Counsel argued father was not making excuses for "mistakes or confusion in the past"; was demonstrating his commitment to reunifying by drug testing, participating in counseling and parenting classes; understood he would need to do more; and was willing even to end his relationship with mother for J.S.'s sake. Additionally, father has a good relationship with J.M. and wanted the children to grow up together as one family.

At the conclusion of counsels' arguments, the court found by clear and convincing evidence that reunification was not in J.S.'s best interest. Explaining its reasoning, the court first focused on the severity of J.S.'s injuries, observing that he "was only three months old when he suffered significant head and brain injuries" with "lasting effects, even five months later," that required "numerous doctors' appointments," and that he had been diagnosed with "unspecified trauma and stressor-related disorder" that the court "can only imagine" was "connected at least in some part to the severe physical abuse." The court also noted the rib fractures that suggested prior episodes of trauma in addition to the brain injuries, all by the time J.S. was three months old. The court found that J.S. suffered these severe injuries "while in the care of both parents," "at the hands of either both parents or one parent, but the other parent had to have known what was going on," and commented that "[t]he very people on this earth who are supposed to protect him from harm actually caused him significant harm."

12

The court found "the fact that neither parent has taken responsibility for either causing the injuries or knowing that was going on . . . extremely troubling." It elaborated, "they blamed a two-year-old for these extensive head injuries. They came up with a ridiculous story that a two-year-old had the capacity to find a three-month-old baby, left alone in a bed, and that that two-year-old had the—enough capacity and forethought to close the door, lock the door, and then beat the baby repeatedly over the head. And then, act as if he was guilty upon supposedly finding this two-year-old walking away or stepping back from the baby, according to their story. They blame the ridiculous story on a person who can't defend themselves, a two-year-old. It's absurd and the Court and the doctors do not believe it."

The court did not believe there were services that would "prevent the reabuse or continued neglect, especially in light of both parents' failure to take responsibility for this abuse." The court also discussed its concern with the parent's "lack of remorse," commenting that mother had expressed feeling sadness and failure with respect to J.M. but said nothing similar concerning J.S. The court also found "the dishonesty in the case very troubling," referring to the parents' dishonesty to the Bureau "about their lack of substance abuse," "the lack of truth about what really happened" to J.S., and "what appeared to be, to this [c]ourt, coaching of J.M. to say specific things that did or did not happen."

Finally, the court found no evidence that J.S. was closely or positively bonded with the parents. The court saw J.S.'s diagnosis of a trauma and stress disorder at only eight months of age as indicative of a lack of bonding

13

or closeness with the parents, and noted that J.S. had bonded with his caregiver.[13]

The court set a section 366.26 hearing for December 4.

The parents each filed a notice of intent to file a writ petition, followed by the present petitions. We issued orders to show cause. The Bureau has not responded to the petitions because its position below was aligned with the parents' and cannot be changed on appeal.

## DISCUSSION

## I.

## *Governing Principles*

" 'Reunification services must be provided to the mother and statutorily presumed father of children who have been removed from their parents' custody, unless a statutory exception applies. [Citations.] The statutory exceptions are contained in subdivision (b) of section 361.5, which states that "[r]eunification services need not be provided" if the court finds "by clear and convincing evidence" that any of 17 enumerated bypass provisions apply.' (*In re A.E.* (2019) 38 Cal.App.5th 1124, 1141 (*A.E.*))." (*In re Raul V.* (2022) 82 Cal.App.5th 290, 299–300.) In addition, section 361.5, subdivision (c), sets forth circumstances in which the court "shall not" order reunification unless the court makes certain findings. (§ 361.5, subd. (c)(2), (3).)

Two of the mandatory bypass provisions are relevant in this case. First, section 361.5, subdivision (c)(2) provides that the court "shall not order reunification" for a parent described in specified paragraphs of subdivision (b)

---

[13] The court additionally explained that it made a different decision on disposition in J.M.'s case because she was nine years old, had a bond with mother and would be able to express if harm was occurring to her or others around her.

"unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child."  One of the specified paragraphs is section 361.5, subdivision (b)(6), which applies where a child has been adjudicated a dependent under section 300 "as a result of . . . the infliction of severe physical harm to the child, . . . and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent."  (§ 361.5, subd. (b)(6)(A).)

Second, subdivision (c)(3) of section 361.5 provides, "[i]n addition, the court shall not order reunification in any situation described in paragraph (5) of subdivision (b) unless it finds that, based on competent evidence, those services are likely to prevent reabuse . . . or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent."  Section 361.5, subdivision (b)(5) provides that reunification services need not be provided to a parent when the court finds by clear and convincing evidence that "the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent . . . ."

The Bureau bears the burden of proving that a bypass provision applies, while the parent bears the burden of proving the facts necessary to overcome a mandatory bypass provision.  (*In re T.R.* (2023) 87 Cal.App.5th 1140, 1148.)  We review a juvenile court's factual findings for substantial evidence.  (*In re Caden C.* (2021) 11 Cal.5th 614, 640 [278 Cal.Rptr.3d 872, 486 P.3d 1096].)  "When the clear and convincing evidence standard of proof applied in the juvenile court to the challenged finding, we must 'account for' that heightened standard by determining whether 'the record as a whole contains substantial evidence from which a reasonable fact finder could have

15

found it *highly probable* the fact was true.'  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011, italics added.)"  (*In re T.R.*, at p. 1150.)

## II.

### *Analysis*

Mother[14] argues that the juvenile court's decision is not supported by substantial evidence in two respects:  There is insufficient evidence to support bypassing reunification services under section 361.5, subdivision (b)(6), and there is insufficient evidence to support the finding that section 361.5, subdivision (c)(2) applied.

The juvenile court expressly based its ruling on section 361.5, subdivisions (b)(5) and (c)(2).  Although it did not reference subdivision (b)(6) by paragraph number in its explanatory remarks, the court could not rely on subdivision (c)(2) without first finding subdivision (b)(6) applied:  As described above, the subdivision (c)(2) mandatory bypass provision applies to parents described in specified paragraphs of subdivision (b), and the only one of these paragraphs relevant to the present case is subdivision (b)(6).

Before turning to mother's arguments concerning section 361.5, subdivisions (b)(6) and (c)(2), however, it is necessary to address what mother does *not* argue.

### A. Reunification Services Were Properly Denied Under Section 361.5, Subdivision (c)(3).

The court expressly stated that its decision was based on section 361.5, subdivision (b)(5), which describes a situation in which reunification services "need not" be provided.  As earlier discussed, subdivision (c)(3), prohibits

_____

[14]  Each of the parents joins in and adopts by reference all arguments in the other's petition that pertains to their benefit.  We discuss the arguments as set forth in mother's petition because father's petition does not present different or additional arguments or authority.

16

reunification services for a parent in "any situation described in" subdivision (b)(5) unless the court makes specified findings. The court here specifically declined to make these findings, thus indicating it was relying on subdivision (c)(3). Despite the court's express reference to subdivision (b)(5) and implicit reference to subdivision (c)(3) by virtue of its findings, mother does not discuss either of these subdivisions.

Section 361.5, subdivision (b)(5), as we have said, states that the court "need not" order reunification services to a parent when it finds by clear and convincing evidence that "the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent." Subdivision (b)(5) applies "to the parent who, knowing the actual abuser, knows or reasonably should have known that the other person was physically mistreating the child, as well as to the parent who personally abuses his or her child." (*In re Joshua H.* (1993) 13 Cal.App.4th 1718, 1732.) Mother does not argue this provision is inapplicable to her.

Given the application of section 361.5, subdivision (b)(5), subdivision (c)(3) would have allowed the court to order reunification services only if it found, based on competent evidence, that such services "are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." Here, the court's findings include, "I do not find that any services will prevent the reabuse or continued neglect" and "I don't find any evidence that the child closely or positively bonded with these parents." These findings, in the language of subdivision (c)(3), demonstrate the court was relying on that subdivision despite it not being expressly identified. Again, mother does not argue this provision does not apply to her.

17

The juvenile court's unchallenged findings under section 361.5, subdivisions (b)(5) and (c)(3) support, and indeed compel, its ruling denying reunification services. Nevertheless, to avoid any possibility of confusion, we will address mother's arguments regarding subdivision (c)(2) and its predicate, subdivision (b)(6).

## B. Substantial Evidence Supports Bypass Under Section 361.5, subdivision (b)(6).

Mother argues section 361.5, subdivision (b)(6) is inapplicable because she did not subject J.S. to physical abuse or participate in physically abusing him. Preliminarily, no one suggested below that section 361.5, subdivision (b)(6) did not apply to this case. Mother argued only that reunification would be in J.S.'s best interest based on her efforts and progress since detention, the Bureau expressly accepted that the court could order reunification services only if it made the findings required by section 361.5, subdivision (c)(2) and (3), in cases of severe abuse to a child under age five, father argued for a second chance based on his efforts to improve his parenting, and counsel for the minor argued both subdivision (b)(5) and (6) applied.

" 'A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court.' (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221.) 'Forfeiture . . . applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings.' (*Id.* at p. 222.) Application of the forfeiture rule is not automatic, and a reviewing court has discretion to consider forfeited claims. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded on other grounds by statute as stated in *In re M.R.* (2005) 132 Cal.App.4th 269, 273–274.) But the 'discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue.' (*In re S.B.*, at p. 1293.) Additionally, we may consider forfeited claims

concerning statutory interpretation that do not involve disputed facts as such a claim could reoccur. (See *In re Jonathan P.* (2014) 226 Cal.App.4th 1240, 1252 [addressing forfeited statutory argument that presented a legal question].)" (*In re H.D.* (2024) 99 Cal.App.5th 814, 817–818.)

These principles provide little basis for excusing the forfeited claims here. Mother's arguments that her conduct does not bring her within the provisions of section 361.5, subdivision (b)(6) are factual, not legal. Still, this case is somewhat unusual in that the Bureau was aligned with the parents in arguing *for* provision of reunification services, and the parents may have felt it less necessary to contest the application of bypass provisions, as to which the Bureau would normally have the burden of proof, than to convince the court reunification would be in J.S.'s best interest. In any event, mother's arguments are not persuasive.

Section 361.5, subdivision (b)(6), as relevant, requires findings that the child was adjudicated a dependent under section 300 "as a result of . . . the infliction of severe physical harm to the child," by a parent, and that it "would not benefit the child" to pursue reunification with the offending parent. For purposes of section 361.5, subdivision (b)(6), "infliction of severe physical harm" "may be based on, but is not limited to, deliberate and serious injury inflicted to or on a child's body . . . by an act or omission of the parent . . . or of another individual . . . with the consent of the parent." (§ 361.5, subd. (b)(6)(C).)

The jurisdictional findings established that J.S. suffered serious physical harm inflicted nonaccidentally while he was in the custody of his parents, it was not plausible the injuries could have been caused by a two year old, as his parents reported, and his parents had not provided a reasonable explanation for the injuries. Mother admits negligence, but

19

maintains she did not *deliberately* injure J.S. or consent to someone else doing so as specified in section 361.5, subdivision (b)(6), and could not have acted by omission because she had no knowledge of the abuse.  Mother points out that there were no witnesses to the incident other than two-year-old G.; four adults were present in the home at the time the incident occurred; G.'s mother said she saw bite marks and a lump on J.S.'s head after the incident; father said the TV was loud and he did not hear anything; and no one accused mother, specifically, of abusing J.S.

The language of section 361.5, subdivision (b)(6) has been interpreted as indicating "[t]he Legislature did not intend subdivision (b)(6) to apply to deny reunification services to a negligent parent; rather, the parent must have been complicit in the deliberate abuse of the child." (*Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 843, 849–850.)  Mother likens her situation to that of the mother in *J.J. v. Superior Court* (2022) 81 Cal.App.5th 447.  There, the father was the direct perpetrator of abuse that occurred when the mother was not at home.  (*Id.* at pp. 451, 456.)  The court denied reunification services for the mother, finding she left the children with the father after having purchased alcohol for him, despite knowing he was having mental health issues and had a history of alcohol abuse and blacking out, and she failed to timely seek medical attention when she learned of the child's injuries.  (*Id.* at pp. 456–457.)  Granting the mother's writ petition, the appellate court explained, "There is no doubt mother's acts were extremely negligent, but they are not necessarily tantamount to consent to abuse without further evidence showing mother had knowledge that father was abusing [the child] or at least likely to abuse [the child]." (*Id.* at p. 457.)

In the present case, the evidence afforded no basis for identifying the actual perpetrator of the abuse, but the court concluded it was perpetrated

20

either by both parents or by one parent with the other knowing it was happening. The court reached this conclusion based on the severity of J.S.'s injuries and the parents' refusal to take responsibility, insistence on an explanation contrary to medical evidence, and dishonesty on this and other matters. In essence, the court concluded there was no explanation for the injuries other than that one or both of the parents deliberately inflicted them and both were aware of the abuse.

The evidence supports this conclusion. J.S. suffered severe physical injury not only in the March 29 incident but on one or more prior occasions, as indicated by the evidence of multiple rib fractures at different stages of healing. According to the physicians who examined him, the injuries were not inflicted accidentally and could not have been inflicted by a two year old. There was no suggestion in the evidence that anyone other than the parents cared for J.S. Both parents offered the same implausible explanation for the March 29 injuries, yet were inconsistent on at least one point that is difficult to view as a minor difference in perception or memory, father saying he opened the door to the bedroom with a credit card while mother said she "broke the door open." Mother's challenge to the court's reliance on section 361.5, subdivision (b)(6), is based entirely on her denial of intent to harm J.S. or awareness of the abuse, thus asking us to accept her assertion of facts as to which the juvenile court expressly found her (and father) dishonest. We will not second guess the juvenile court's credibility determination.

### C. Substantial Evidence Supports the Juvenile Court's Reliance on Section 361.5, subdivision (c)(2).

Mother additionally contends there "is not substantial evidence to support the court's finding by clear and convincing evidence that section 361.5, subdivision (c)(2), applied." (Capitalization and boldface

21

omitted.) Her argument is that reunification is in J.S.'s best interest because of her commitment to and progress on her case plan, including maintaining consistent and positive visitation, completing her parenting class, demonstrating negative drug tests, participating in individual therapy, obtaining employment and enrolling in school. Mother also argues that reunification is in J.S.'s best interest because of his sibling relationship with J.M. Father, to similar effect, maintains the juvenile court focused on the seriousness of J.S.'s injuries but failed to consider father's efforts and successful progress in services, including maintaining his sobriety, completing his parenting program and progressing in counseling.

Mother's description of her contention as a substantial evidence challenge to the court's "finding by clear and convincing evidence that section 361.5, subdivision (c)(2), applied" leaves unclear exactly what finding she believes to be unsupported. (Capitalization and boldface omitted.) The finding subdivision (c)(2) requires to be made by clear and convincing evidence is the best interest finding necessary to overcome the prohibition against reunification services once it has been determined that the parent is subject to subdivision (c)(2). Here, the question whether subdivision (c)(2) applied turned on the predicate finding that the parents were described by subdivision (b)(6), and subdivision (b)(6) required *that* finding to be made by clear and convincing evidence. But mother presents her challenge to subdivision (c)(2) as a distinct argument separate from her challenge to subdivision (b)(6), addressed above.

We assume mother's challenge to the court's finding that section 361.5, subdivision (c)(2) applied refers to the court's *refusal* to make the finding it would have had to make in order to provide reunification services. In arguing the evidence demonstrates reunification is in J.S.'s best interest, mother "is

22

not challenging the sufficiency of the evidence to support a finding that the juvenile court made or was required to make in order to bypass her," but rather "challenging the juvenile court's failure to make a finding that would have been required in order *not* to bypass her." (*In re Raul V., supra,* 82 Cal.App.5th at p. 300.) As it was mother's burden to show reunification would be in J.S.'s best interest in order to overcome the subdivision (c)(2) bypass provision (*In re T.R., supra,* 87 Cal.App.5th at p. 1148), the court's ruling to the contrary was in effect a determination that mother failed to carry her burden of proof.

"In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds in *Conservatorship of O.B., supra,* 9 Cal.5th at pp. 989, 1010, fn. 7.) "Rather, 'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law,' that is, whether the evidence supporting Mother's position 'was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*In re Raul V., supra,* 82 Cal.App.5th at pp. 300–301, quoting *In re I.W.,* at p. 1528.)

We cannot reach this conclusion. We do not question mother's commitment to and progress on her reunification plan, which the Bureau described in very positive terms. The juvenile court's decision, however, was not based on any conclusion that mother was not committed or not performing well on the case plan. The court's concern was with the severity

of J.S.'s injuries and the parents' insistence that they were caused in a manner refuted by the medical findings, as well as the parents' "dishonesty in the case." The court concluded that in light of the parents' "failure to take responsibility" and "complete lack of remorse," there were no services that would prevent reabuse. The court further concluded that J.S., having been removed from the parents' custody at three months of age, did not have a strong and positive bond with them. In short, mother's arguments based on her efforts to improve her parenting skills do not address the concerns underlying the court's decision.

The same is true of the parents' additional argument that reunification is in J.S.'s best interest due to the sibling bond between him and J.M. The court did order reunification services in J.M.'s case; the court explained that it did so based on J.M.'s age and bond with her mother. The parents argue that it is in J.S.'s best interest to maintain his relationship with J.M., which will not be possible if she reunifies with the parents and J.S. is not permitted to do the same.

Sibling bonds are indeed given significant weight in dependency proceedings. As the parents point out, the dependency scheme includes mechanisms for siblings to seek continuation of their relationship, for example, by providing for siblings to request visitation or placement with or near a dependent child. (§ 388, subd. (b).) When reunification services are terminated, one of the few statutory exceptions to adoption as the first choice in permanency planning is for protection of a child's sibling relationships. (§ 366.26, subd. (c)(1)(B)(v).) This exception applies when there would be "substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home,

24

whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

But the focus of these provisions is on the best interests of the dependent child. (See, e.g., §§ 366.26, subd. (c)(1)(B)(v), 388, subd. (b)(1), (4)(D).) For example, "[w]hen considering the sibling relationship exception, the concern is the best interests of the child being considered for adoption, not the interests of that child's siblings. '[T]he court may reject adoption under this sibling relationship provision only if it finds adoption would be detrimental to the child whose welfare is being considered. It may not prevent a child from being adopted solely because of the effect the adoption may have on a sibling.' (*In re Celine R.* [(2003)] 31 Cal.4th [45,] 49–50.)" (*In re Naomi P.* (2005) 132 Cal.App.4th 808, 822.)

Mother points to *In re Naomi P., supra,* 132 Cal.App.4th 808, as an example of the priority given to sibling relationships. There, by the time the court was considering the significance of the sibling relationships at the section 366.26 hearing, the dependent child was three years old and knew her older siblings were her brothers and sister. (*In re Naomi P.,* at pp. 811, 814, 816.) While she was too young to testify for herself, the court determined from the siblings' testimony that they were describing "a true sibling relationship" and deep love for the child, and that their happiness in visiting her also reflected the child's enjoyment of the siblings' visits. (*Id.* at p. 821.) J.S. was not quite eight months old at the time of the disposition hearing. We have no reason to question his nine-year-old sister's love for him and desire to continue their relationship, and certainly the parents had a strong

25

interest in the children's relationship, but J.S. was simply too young to understand the significance of a sibling relationship. Weighed against the court's concerns about the parents' treatment of J.S. and attitude toward his abuse, we cannot conclude the sibling relationship compelled a conclusion that reunification would be in J.S.'s best interest.

## DISPOSITION

The petitions are denied. Our decision is final immediately. (See Cal. Rules of Court, rule 8.490(b)(2)(A).)

STEWART, P. J.

We concur.

RICHMAN, J.

DESAUTELS, J.

*J.M. et al. v. Superior Court (Contra Costa County)* (A174020)